IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 94-20461
_____

SIERRA CLUB, LONE STAR CHAPTER,

Plaintiff-Counter
Defendant-Appellee,

v.

CEDAR POINT OIL COMPANY INC.,

Defendant-Counter
Claimant-Appellant.

_____

No. 95-20227
_____

SIERRA CLUB, LONE STAR CHAPTER,

Plaintiff-Counter
Defendant-Appellant,

v.

CEDAR POINT OIL COMPANY INC.,

Defendant-Counter
Claimant-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Texas
_____

January 11, 1996


Before REYNALDO G. GARZA, KING and HIGGINBOTHAM, Circuit Judges.

KING, Circuit Judge:

These consolidated appeals arise from an action brought by Sierra Club, Lone Star Chapter ("Sierra Club"), against Cedar Point Oil Company ("Cedar Point") under the citizen suit provision of the Clean Water Act ("CWA"), 33 U.S.C. § 1365. Sierra Club alleged that Cedar Point was violating the CWA by discharging produced water into Galveston Bay without a permit and sought civil penalties and an order enjoining the unpermitted discharge. Cedar Point counterclaimed for abuse of process. Before trial, the district court granted summary judgment in favor of Sierra Club on the issue of Cedar Point's liability under the CWA and dismissed Cedar Point's counterclaim. After a bench trial, the district court assessed a civil penalty of $186,070. Cedar Point appeals. The district court also enjoined the discharge of produced water from Cedar Point's oil and gas production operations without a permit; however, the court later modified this injunction to allow Cedar Point to continue the unpermitted discharge. Sierra Club appeals this modification. We affirm in all respects the judgment of the district court.

## I. BACKGROUND

### A. Facts

#### 1. "Produced Water"

This lawsuit concerns the legality of the disposal of a by-product of the oil and gas production process: "produced water." Produced water originates as source water trapped in underground geological formations with oil and gas. When a well is drilled

2

into a formation, the extraction of oil and gas also brings the water to the surface. During extraction, chemicals used in the drilling process become mixed with the water. The result is produced water.[1]

Part of the production process involves the separation of the produced water from the extracted oil and gas. After separation, the operator must dispose of the produced water. The available methods of disposal include reinjection into an underground reservoir, land disposal, evaporation, and discharge into surface waters. Produced water is the highest volume waste source in offshore oil and gas production operations.[2]

## 2. Cedar Point's Operations

Cedar Point is a Mississippi corporation that owns and operates an oil and gas well and associated facilities in the Cedar Point field ("the field"), which is located in Galveston

---

[1] The Environmental Protection Agency has defined produced water as "water and particulate matter associated with oil and gas producing formations. Produced water includes small volumes of source water and treatment chemicals that return to the surface with the produced formation fluids and pass through the produced water treating systems currently used by many oil and gas operators." 57 Fed. Reg. 60,926, 60,951 (1992). For discussions of the origin and composition of produced water, see BP Exploration & Oil, Inc. v. U.S.E.P.A., 66 F.3d 784, 792 (6th Cir. 1995); Natural Resources Defense Council v. U.S.E.P.A., 863 F.2d 1420, 1425 (9th Cir. 1988); American Petroleum Inst. v. E.P.A., 661 F.2d 340, 343 (5th Cir. 1981).

[2] BP Exploration & Oil, 66 F.3d at 792; Natural Resources Defense Council v. U.S.E.P.A., 863 F.2d at 1425.

Bay in Chambers County, Texas.[3]  John McGowan ("McGowan"), Cedar Point's principal shareholder, purchased the field from Chevron Corporation ("Chevron") on July 1, 1989.  At that time, the field contained twenty-two abandoned wells and three producing wells. McGowan shut down the producing wells approximately one month after he purchased the field.  On January 1, 1991, McGowan transferred the field to Cedar Point.[4]  Later that year, Cedar Point drilled its first well since acquiring the field: state well 1876.[5]  Cedar Point began producing oil and gas from this well on September 10, 1991.

Cedar Point began to discharge produced water into Galveston Bay at approximately the same time that it began production from state well 1876.  This discharge continued through the trial of this action in May 1994, except that the discharge was temporarily suspended between April and August of 1992. Throughout this period, the average daily discharge ranged between 500 to 1200 barrels per day.[6]  Cedar Point's produced

---

[3]The field and associated facilities are Cedar Point's only assets.  Cedar Point itself has no regular employees, but contracts for necessary services with McGowan Working Partners, a Mississippi partnership that conducts oil and gas operations in Louisiana, Mississippi, and Texas.  While most of the contractors who do work for Cedar Point hold interests in McGowan Working Partners, the partnership is not a party to this action.

[4]This transfer is characterized as a "purchase" in some of the documents in the record on appeal; however, David Russell, Cedar Point's vice-president, testified that Cedar Point acquired the field from McGowan at no cost.

[5]At the time this action commenced, Cedar Point had apparently not drilled any other wells in the field.

[6]A barrel contains 42 gallons.

water contained, <u>inter alia</u>, barium, benzene, zinc, chlorides, sulfate, bicarbonate, ammonia, naphthalene, phenolic, radium, oil and grease.  Cedar Point disposed of its produced water in the following manner:  (1) the oil, gas, and water mixture produced from state well 1876 was piped to a platform in Galveston Bay for the first phase of separation; (2) after the initial separation, the remaining mixture was then piped to shore where more oil was separated in a series of tanks; (3) the produced water was then transferred to settling pits so that some constituents could settle out of the water; and (4) the remaining produced water was drained out of the pits and discharged through a pipe over the bulkhead into Galveston Bay.[7]

## 3.  The Permits

Between August 1971 and July 1989, Chevron discharged produced water from the onshore separating facility pursuant to a permit issued by the Texas Railroad Commission ("the Railroad Commission").  This permit set limitations only on the oil and grease content of the produced water that was being discharged. After McGowan purchased the field, the Railroad Commission transferred Chevron's Commission permit to McGowan.  The letter from the Railroad Commission authorizing this transfer stated that a permit from the Environmental Protection Agency ("EPA") may be required for the discharge of produced water under the

_____

[7]Originally, the produced water had been discharged into a marsh near the shore facility.  In modifying the separation system, Cedar Point changed the discharge point to Galveston Bay.

National Pollutant Discharge Elimination System ("NPDES").  David Russell ("Russell"), who reviewed the transferred permit for McGowan, testified that he did not read this sentence in the letter; however, he did review Chevron's files, which did not reveal any NPDES permit or NPDES permit application in the twenty-year period of Chevron's ownership of the field.  Based on this review, Russell did not apply for a NPDES permit for McGowan at that time.

After McGowan transferred the field to Cedar Point in 1991, Russell commenced negotiations with the Railroad Commission to transfer McGowan's Commission permit to Cedar Point.  This negotiation took several months, apparently because Cedar Point and the Railroad Commission disputed the terms of the Commission permit that Cedar Point would ultimately receive.  Cedar Point finally obtained a Commission permit in September 1992, again establishing limitations only on the oil and grease content of the produced water that was being discharged.[8]  According to Russell, while he was negotiating the terms of this permit, Railroad Commission employees informed him that oil and gas operators in Galveston Bay were being sued for discharging produced water into the bay without a NPDES permit.  Also, the

---

[8]Because Cedar Point began discharging produced water into Galveston Bay in September 1991, it had been discharging without a Commission permit of its own for twelve months.  Russell testified that he assumed that Cedar Point could discharge pursuant to McGowan's Commission permit pending the approval of Cedar Point's transfer application.  Although Sierra Club apparently questioned the legal basis of this assumption at trial, the legality of Cedar Point's discharges under Texas law is not an issue in this lawsuit.

6

final Commission permit that Cedar Point received in September 1992 advised that a NPDES permit may be required for the discharge of produced water and that EPA was considering prohibiting such discharges. Accordingly, on October 15, 1992, Cedar Point applied to EPA for a NPDES permit for its produced water discharges.

By letter dated November 5, 1992, EPA informed Cedar Point that its application for a NPDES permit had been reviewed and determined to be administratively complete. Since this acknowledgment, however, EPA has failed to act on the application. On December 30, 1992, Russell submitted a request to EPA under the Freedom of Information Act ("FOIA"),[9] asking whether EPA had ever issued a permit for the discharge of produced water in Texas. On February 4, 1993, EPA responded that it had issued two such permits. The first permit was a general permit[10] that applied to oil and gas operators in the "Offshore Subcategory" in Louisiana and Texas and established limitations on the oil and grease content of discharged produced water.[11]

---

[9] 5 U.S.C. § 552.

[10] There are two types of NPDES permits: individual and general. Typically, EPA will promulgate a nationally uniform "effluent limitation" on the discharge of a particular pollutant and implement that limitation in the form of individual NPDES permits issued to entities discharging that pollutant. See 33 U.S.C. §§ 1311, 1342. Where EPA has not yet promulgated such an effluent limitation, however, it may regulate the discharge of pollutants by issuing a general NPDES permit that applies to a class of similar entities located in a particular geographical region. See Natural Resources Defense Council v. Costle, 568 F.2d 1369, 1380-82 (D.C. Cir. 1977); 40 C.F.R. § 122.28.

[11] 46 Fed. Reg. 20,284 (1981).

The second permit was also a general permit that applied to oil and gas operators in the "Onshore Subcategory" in Louisiana, New Mexico, Oklahoma, and Texas; this permit established an absolute prohibition on the discharge of produced water by these entities.[12] Neither of these permits applied to Cedar Point because Cedar Point is in the "Coastal Subcategory."[13] In fact, at that time the only regulation that EPA had promulgated that applied to the discharge of produced water by Coastal Subcategory operators was an effluent limitation on the oil and grease content of discharged produced water;[14] however, EPA had never implemented this limitation through a general permit or individual permits. As a result, none of Cedar Point's produced water discharges was authorized by a NPDES permit.

## B. Procedural History

### 1. Cedar Point's Collateral Action

By letter dated December 16, 1992, Sierra Club informed Cedar Point that the discharge of produced water without a NPDES permit

---

[12]56 Fed. Reg. 7698 (1991).

[13]EPA has divided the category of "Oil and Gas Extraction Point Sources" into several subcategories for the purpose of regulating discharges: "Offshore," "Onshore," "Coastal," "Stripper," and "Agricultural and Wildlife Water Use." 40 C.F.R. § 435. The "Coastal Subcategory" includes facilities engaged in oil and gas production, field exploration, drilling, and well completion and treatment in "any body of water landward of the territorial seas as defined in 40 C.F.R. 125.1(gg), or any wetlands adjacent to such waters." 40 C.F.R. §§ 435.31(e), 435.40.

[14]40 C.F.R. § 435.42.

8

violated the CWA and that Sierra Club planned to seek monetary penalties and an order enjoining Cedar Point's unpermitted discharges.[15]  In response to this letter, Cedar Point filed an action against Sierra Club and EPA in the United States District Court for the Southern District of Mississippi.  In its complaint, Cedar Point alleged, <u>inter alia</u>, that Sierra Club had "threatened" Cedar Point with a citizen suit and, impliedly, that EPA and Sierra Club were conspiring to deprive Cedar Point of unspecified constitutional rights.  Specifically, Cedar Point requested the district court to issue an order that: (1) required EPA to respond to Cedar Point's then-unanswered FOIA request; (2) required EPA to rule upon Cedar Point's application for a NPDES permit; and, (3) enjoined Sierra Club from filing a citizen suit against Cedar Point.  On July 12, 1993, the district court dismissed Cedar Point's claims against Sierra Club.[16]

## 2.  Sierra Club's Citizen Suit

Sierra Club filed the present action against Cedar Point on April 20, 1993, in the United States District Court for the Southern District of Texas.  In its complaint, Sierra Club prayed

---

[15]The CWA requires that a person bringing an action under the citizen suit provision send an "intent to sue" letter to the EPA, the alleged violator, and the state in which the alleged violation occurs at least 60 days prior to the commencement of the action.  33 U.S.C. § 1365(b)(1).

[16]The court apparently has not disposed of Cedar Point's claims against EPA.  The last docket entry in the case indicates that the court held a hearing on EPA's motion to dismiss on September 19, 1994, "with written opinion to follow in about a week."

for: (1) a judgment declaring that Cedar Point's unpermitted discharges of produced water into Galveston Bay violated the CWA; (2) a permanent injunction prohibiting future unpermitted discharges; and (3) penalties for past unpermitted discharges. The district court immediately entered an Order for Accelerated Discovery, requiring the parties to make certain disclosures without waiting for discovery requests. This order directed, inter alia, that the parties disclose at least ninety days prior to trial the expert testimony that they would offer at trial.

Cedar Point filed its answer and a counterclaim against Sierra Club on August 18, 1993. The counterclaim alleged that Sierra Club's lawsuits against Cedar Point and other oil and gas operators in the bay constituted an abuse of process. Cedar Point sought compensatory damages for the emotional distress suffered by its officers and directors and $10,000,000 in punitive damages. Sierra Club moved to dismiss this counterclaim. The district court ultimately entered an order granting Sierra Club's motion on the grounds that, because Sierra Club's citizen suit was not frivolous, it could not be the basis for a claim for abuse of process.

Sierra Club then filed a motion for partial summary judgment on the issue of Cedar Point's liability under the CWA. In response, Cedar Point filed a cross-motion for partial summary judgment on the issues of its liability, Sierra Club's ability to state a claim under the CWA, and Sierra Club's standing to sue. The district court entered an order granting Sierra Club's motion

10

for partial summary judgment and denying Cedar Point's similar motion on the liability issue. Specifically, the court found as a matter of law that Cedar Point had discharged pollutants without a NPDES permit in violation of the CWA. The court also denied Cedar Point's motion on the issue of Sierra Club's standing to sue. In this regard, the court found that the affidavits submitted by Sierra Club established that some of its members had suffered injuries in fact that were fairly traceable to Cedar Point's discharge of produced water, and therefore were sufficient to defeat a motion for summary judgment.

Sierra Club also filed a motion to strike Cedar Point's designation of experts that it would offer at trial. In this motion, Sierra Club alleged that Cedar Point had failed to comply with that part of the district court's discovery order requiring "written report[s] prepared and signed by the witness[es] which include[] a complete statement of all opinions to be expressed and the basis and the reasons therefor." Specifically, Sierra Club complained that the reports submitted by Cedar Point were so substantively inadequate that Sierra Club would be substantially prejudiced if the court allowed these witnesses to testify. The court granted Sierra Club's motion to strike Cedar Point's experts, finding that Cedar Point had failed to comply with its discovery order.

The issues of the penalties to be assessed against Cedar Point for its past violations and Sierra Club's request for injunctive relief were tried to the bench. The court issued its

opinion and judgment on May 27, 1994.  First, the court imposed a civil penalty of $186,070 based on the economic benefit that accrued to Cedar Point because of its failure to comply with the CWA -- i.e., the money it saved by not constructing a disposal system that would have resulted in zero discharge.  Second, the court enjoined Cedar Point from discharging produced water from its operations at the field into Galveston Bay until it obtained a NPDES permit.[17]  Finally, the court awarded Sierra Club $60,000 in attorneys' fees as the prevailing party in the litigation.[18] The court later increased this award to $82,956.86.  Cedar Point timely filed its notice of appeal from this judgment as well as the court's pretrial rulings, including the dismissal of Cedar Point's counterclaim and the partial summary judgment on the issue of Cedar Point's liability under the CWA.

3. **Amendment of the Injunction**

On January 9, 1995, EPA published a final NPDES general permit covering the discharge of produced water by operators in the "Coastal Subcategory" in Louisiana and Texas, including Cedar Point.[19]  This permit imposed, inter alia, an absolute prohibition on the discharge of produced water, effective

---

[17]The court also imposed a penalty for each day Cedar Point violated the injunction after August 31, 1994.

[18]See 33 U.S.C. § 1365(d).

[19]60 Fed. Reg. 2387 (1995).  A draft version of this permit had been published on December 22, 1992, five months before the trial in this action.  57 Fed. Reg. 60,926 (1992).

12

February 8, 1995.  Along with the permit, however, EPA issued an administrative compliance order that qualified somewhat this effective date.[20]  The compliance order recognized that many operators would have to reinject their produced water in order to comply with the permit's "No Discharge" provision.  Because existing reinjection well operators, state permitting authorities, and drilling contractors would probably be unable to meet the demand for reinjection occasioned by the terms of the permit, complete compliance by all covered operators would necessarily be delayed until well after the February 8 effective date.  Accordingly, the order directed the permittees to "[c]omplete all activities necessary to attain full and continuance [sic] compliance with [the "No Discharge" requirement] as soon as possible, but in no case later than January 1, 1997;" however, this order only applied to operators covered by the permit who would be discharging produced water on the effective date of the permit, February 8, 1995.[21]

Cedar Point could not discharge produced water on February 8 because the district court's injunction order prevented it from doing so without penalty.  Accordingly, on January 30, 1995, Cedar Point filed a motion to amend or supplement the court's final judgment to allow it to discharge produced water without

---

[20]60 Fed. Reg. at 2393.

[21]The order also required covered operators to prepare a Compliance Plan.  The order states that "[a] Compliance Plan shall include a description of the measures to be taken, along with a schedule, to cease discharge of produced water to waters of the United States as expeditiously as possible."

penalty on the effective date of the permit and thereafter so that it could take advantage of the two-year "grace period." The district court granted this motion and amended its May 27, 1994 opinion to allow the requested discharge. Sierra Club timely filed a notice of appeal from the court's order amending the injunction.

## II. DISCUSSION

### A. Cedar Point's Appeal

In its appeal from the judgment of the district court, Cedar Point raises the following points of error: (1) Sierra Club lacks standing to bring this action; (2) Sierra Club has failed to state a claim under the citizen suit provision of the CWA; (3) Cedar Point's discharges of produced water into Galveston Bay do not violate the CWA; (4) the district court erred in striking Cedar Point's designation of experts and excluding their testimony; (5) the district court erred in calculating the amount of the penalty imposed and in awarding attorneys' fees to Sierra Club; and (6) the district court erred in dismissing Cedar Point's counterclaim for abuse of process. We address each of these arguments in turn.

### 1. Standing

Cedar Point's first argument on appeal is that Sierra Club lacks standing to bring this citizen suit. Specifically, Cedar Point argues that Sierra Club members have not shown the

14

requisite "injury in fact" nor have they demonstrated that the alleged injury is "fairly traceable" to Cedar Point's discharge. Rather, Cedar Point claims that the affidavits submitted by Sierra Club members showed only a concern over produced water discharges into Galveston Bay, but not an injury from those discharges, much less an injury traceable to Cedar Point's discharges in particular. We review a district court's holding on the issue of standing de novo.[22] MD II Entertainment, Inc. v. City of Dallas, 28 F.3d 492, 497 (5th Cir. 1994); United States v. $38,570 U.S. Currency, 950 F.2d 1108, 1111 (5th Cir. 1992).

An organization such as Sierra Club has standing to bring an action on behalf of its members where: (1) the organization's members would have standing to sue individually; (2) the organization is seeking to protect interests that are germane to its purpose; and (3) neither the claim asserted nor the relief

---

[22]It is unclear what the district court's rulings on Sierra Club's standing were, or indeed, whether the court held anything at all on this issue. Cedar Point had moved for partial summary judgment on the issues of statutory and constitutional standing. In denying this motion, the court did not comment on the statutory standing issue and stated only that the affidavits submitted by Sierra Club's members were sufficient to defeat summary judgment as to constitutional standing. The effect of this ruling was to leave the standing issues to be tried, and indeed, one of Sierra Club's affiants did testify at trial as a fact witness on the issue of constitutional standing. In its Memorandum Opinion, however, the court stated that it had "specifically held that Sierra Club had standing to pursue enforcement of this Clean Water Act claim" in its Partial Summary Judgment Order. Therefore, it is questionable whether the district court ever actually ruled on the standing issues. Nevertheless, because our review is de novo, this discrepancy does not affect our treatment of the issues. In addition, standing is a jurisdictional requirement, and may always be addressed for the first time on appeal. In re Taxable Mun. Bond Sec. Litig., 51 F.3d 518, 521 (5th Cir. 1995).

15

requested requires the organization's members to participate in the lawsuit. <u>Hunt v. Washington State Apple Advertising Comm'n</u>, 432 U.S. 333, 343 (1977); <u>National Treasury Employees Union v. U.S. Dep't of Treasury</u>, 25 F.3d 237, 241 (5th Cir. 1994); <u>Save Our Community v. U.S.E.P.A.</u>, 971 F.2d 1155, 1160 (5th Cir. 1992). The parties do not dispute that Sierra Club satisfies the second and third prongs of this test. Rather, it is the standing of individual members of Sierra Club that is at issue.

In order to establish individual standing, a person must show that: (1) he has suffered an actual or threatened injury as a result of the actions of the defendant; (2) the injury is "fairly traceable" to the defendant's actions; and (3) the injury will likely be redressed if he prevails in his lawsuit. <u>Save Our Community</u>, 971 F.2d at 1160 (quoting <u>Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.</u>, 454 U.S. 464, 472 (1982)). There is no question that an injunction would redress the injuries allegedly suffered by Sierra Club members who visit and recreate in Galveston Bay. Therefore, we focus on the "injury in fact" and "fairly traceable" requirements.

### a. "Injury in Fact"

Sierra Club submitted affidavits from three of its members in response to Cedar Point's standing challenge. These affiants described how they use Galveston Bay for various recreational activities, including swimming, canoeing, and bird watching.

16

Also, two of the affiants commented that they live near the Bay. With respect to produced water, each affiant made the following statement:

> I am familiar with "produced water" that is being discharged into Galveston Bay by oil and gas production facilities located on the Bay. I am concerned that the discharge of produced water adversely affects the water quality and the wildlife of the Bay. Therefore, I am concerned that the continued discharge of produced water will impair my ability to enjoy the activities in which I participate.

Only one of the affiants, Tommy Douglas ("Douglas"), indicated that he had participated in activities in the vicinity of Cedar Point's discharge. None of the affiants stated that Cedar Point's produced water in particular had impaired or threatened to impair his use of the Bay.

Cedar Point makes much of the fact that the affiants expressed "concern" that the discharge of produced water will impair their ability to engage in recreational activities. Such language, Cedar Point argues, stated only an interest in eliminating produced water discharges into Galveston Bay, and not an injury in fact. We find no merit in this contention. Whether the affiants were "concerned" or "believed" or "knew to a moral certainty" that produced water would adversely affect their activities on the Bay is a semantic distinction that makes little difference in the standing analysis. The requirement that a party demonstrate an injury in fact is designed to limit access to the courts to those "who have a direct stake in the outcome," Valley Forge Christian College, 454 U.S. at 473 (quoting Sierra

17

<u>Club v. Morton</u>, 405 U.S. 727, 740 (1972)), as opposed to those who "would convert the judicial process into `no more than a vehicle for the vindication of the value interests of concerned bystanders.'" <u>Id.</u> (quoting <u>United States v. SCRAP</u>, 412 U.S. 669, 687 (1973)). Sierra Club's affiants are concerned, but they are not mere "bystanders." Two of the affiants live near Galveston Bay and all of them use the Bay for recreational activities. All of the affiants expressed fear that the discharge of produced water will impair their enjoyment of these activities because these activities are dependent upon good water quality. Clearly, Sierra Club's affiants have a "direct stake" in the outcome of this lawsuit.

That this injury is couched in terms of future impairment rather than past impairment is of no moment. The Supreme Court has expressly held that a "threatened injury" will satisfy the "injury in fact" requirement for standing. <u>Id.</u> at 472 (quoting <u>Gladstone, Realtors v. Village of Bellwood</u>, 441 U.S. 91, 99 (1979)); <u>see also</u> <u>Sierra Club v. Simkins Indus., Inc.</u>, 847 F.2d 1109, 1113 & n.4 (4th Cir. 1988) (noting that affidavit establishing threat of future injury met Article III standing requirements), <u>cert. denied</u>, 491 U.S. 904 (1989). Also, at least one of the affiants did claim to have suffered a past injury: Mark Muhich ("Muhich") stated that, during a number of his bird watching trips in Galveston Bay, he had observed discolored water, oil, and grease, and had detected unpleasant odors; he also asserted that polluted water impaired his enjoyment of bird

18

watching.  The Third Circuit has held that this precise sort of injury satisfies the "injury in fact" requirement for standing. Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 71 (3rd Cir. 1990) (finding sufficient injury where plaintiff organization submitted affidavit of member who stated that he was offended by brown color and bad odor of water body adjacent to park where he went bird watching), cert. denied, 498 U.S. 1109 (1991).

Moreover, we have held that affidavits similar to those submitted by Sierra Club were sufficient to satisfy the "injury in fact" requirement in a citizen's suit brought under the CWA. In Save Our Community, the plaintiff organization supported its standing argument with affidavits by some of its members who owned property or lived in the vicinity of the wetlands that were being drained by the defendant.  These affiants stated that they enjoyed "the wildlife, aesthetics, open space, ecological and other values of the wetlands, . . . and [were] directly and beneficially interested in the continued protection, preservation, and enhancement of these values."  Id. at 1160-61. In holding that these affidavits demonstrated a constitutionally sufficient injury in fact, we noted that "harm to aesthetic, environmental, or recreational interests is sufficient to confer standing, provided that the party seeking review is among the injured."  Id. at 1161 (citing Sierra Club v. Morton, 405 U.S. at 734-35).  We also recognized that "[t]hese injuries need not be large, an identifiable trifle will suffice."  Id. at 1161

19

(quoting <u>Powell Duffryn</u>, 913 F.2d at 71 (internal quotations omitted)).  Given this low threshold requirement,[23] we hold that the affidavits submitted by Sierra Club are sufficient to satisfy the "injury in fact" prong of the test for standing.

### b.  "Fairly Traceable"

Cedar Point further argues that, even if the affidavits submitted by Sierra Club do establish an injury, they do not establish that the injury is fairly traceable to Cedar Point's discharge of produced water.  In this regard, Cedar Point focuses on the affidavits of Douglas and Muhich.  Cedar Point notes that Douglas, the only affiant who stated that he engaged in activity in the vicinity of Cedar Point's discharge, failed to assert that Cedar Point's produced water <u>in particular</u> injured him in any way.  Cedar Point also notes that Muhich, the only affiant who claimed to observe discolored water and foul odors, did not allege that he made these observations in that part of Galveston

---

[23]CWA cases from other circuits corroborate our observation that the threshold for the injury requirement is fairly low. <u>See, e.g.</u>, <u>United States v. Metropolitan St. Louis Sewer Dist. (MSD)</u>, 883 F.2d 54, 56 (8th Cir. 1989) (finding sufficient injury where complaint alleged that defendant had discharged pollutants into Mississippi River without a permit, that many of the intervenor organization's members used the river for recreational purposes, and that pollution of the water adversely affected this recreational interest); <u>Simkins Indus.</u>, 847 F.2d at 1112 n.3 & 1113 (finding sufficient injury where the affidavit of a single group member who regularly hiked along river alleged that defendant's activities adversely affected his activities and interests); <u>Friends of the Earth v. Consolidated Rail Corp.</u>, 768 F.2d 57, 61 (2nd Cir. 1985) (finding sufficient injury where organization submitted affidavit of member who regularly drove on bridge over river and was offended by pollution in the river).

Bay near Cedar Point's discharge.  Accordingly, Cedar Point urges that Sierra Club has not met the "fairly traceable" requirement of standing.

The Third Circuit has articulated a three-part test for establishing that an injury is "fairly traceable" to a defendant's discharge in a citizen suit under the CWA.  Powell Duffryn, 913 F.2d at 72.  According to this test, the plaintiff must "show[] that a defendant has (1) discharged some pollutant in concentrations greater than allowed by its permit (2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and that (3) the pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs."  Id.  While an overly broad application of this test may be problematic, see infra n.24, its application to this case is useful.

Applying this test to Douglas, we find that Sierra Club has established that his injury is fairly traceable to Cedar Point's discharge.  First, because Cedar Point does not even have a permit for its discharges of produced water, any discharge exceeds that which is allowed under the CWA.  Second, Douglas asserted in his affidavit and testified that he has canoed and participated in educational trips in the vicinity of Cedar Point's discharge, and that he intends to continue these activities in this area in the future.  These assertions establish Douglas's interest in that part of Galveston Bay around Cedar Point's discharge.  With respect to whether produced water

21

does or may adversely affect Galveston Bay, Sierra Club presented expert testimony that Cedar Point's produced water was typical in many respects, and that typical produced water has harmful effects on water quality and marine life.

Finally, produced water contributes to the types of injuries alleged by Douglas, including his fear that the harmful effects on water quality and the ecosystem will impair his ability to enjoy canoeing and observing wildlife. Contrary to Cedar Point's suggestion, the Constitution does not require Sierra Club to produce an affiant who claims that Cedar Point's discharge in particular injured him in some way. We have noted that "the fairly traceable element does not require that the plaintiffs `show to a scientific certainty that [the] defendant's effluent, and [the] defendant's effluent alone, caused the precise harm suffered by the plaintiffs.'" Save Our Community, 971 F.2d at 1161 (quoting Powell Duffryn, 913 F.2d at 72). Given the number of entities discharging chemicals into Galveston Bay, it would be virtually impossible for any of Sierra Club's members to trace his injuries to Cedar Point's discharge in particular. Rather, it is sufficient for Sierra Club to show that Cedar Point's discharge of produced water contributes to the pollution that impairs Douglas's use of the Bay. See Natural Resources Defense Council, Inc. v. Watkins, 954 F.2d 974, 980 (4th Cir. 1992); Powell Duffryn, 913 F.2d at 72 n.8. Therefore, we hold that

22

Sierra Club has, by Douglas's affidavit, met the "fairly

traceable" requirement for standing.[24]


## 2. Stating a Claim Under the CWA

Cedar Point also contends that Sierra Club has failed to

state a claim under the citizen suit provision of the CWA because

Sierra Club has not alleged that Cedar Point is violating an

---

[24]Because we hold that Douglas's affidavit establishes an injury in fact that is fairly traceable to Cedar Point's discharge, we need not decide whether Sierra Club's other affiants also meet the "fairly traceable" requirement. See, e.g., Simkins Indus., 847 F.2d at 1113 (4th Cir. 1988) (finding organizational standing where one member's affidavit established individual standing), cited with approval in Save Our Community, 971 F.2d at 1161.

We note, however, that Douglas was the only affiant who expressed an interest in that part of Galveston Bay where Cedar Point's discharge is located. It is true that a strict application of the Powell Duffryn test does not demand that sort of specificity, because the plaintiff need only show an interest in the "waterway" into which the defendant is discharging a pollutant; nevertheless, such a literal reading of Powell Duffryn may produce results incongruous with our usual understanding of the Article III standing requirements. For example, some "waterways" covered by the CWA may be so large that plaintiffs should rightfully demonstrate a more specific geographic or other causative nexus in order to satisfy the "fairly traceable" element of standing. Cf. Lujan v. National Wildlife Fed'n, 497 U.S. 871, 889 (1990) (holding that an affidavit alleging general use of a two million-acre land area was not specific enough to preclude summary judgment on the issue of statutory standing where the challenged action affected only 4500 of the two million acres); Natural Resources Defense Council, Inc. v. Watkins, 954 F.2d at 979 (4th Cir. 1992) (reversing district court's finding of no standing in a CWA case where affiants alleged use of river near the discharge site because the affidavits did not require the court "to assume any particularized geographic usage by the affiants to establish the injury necessary to confer standing"). Therefore, while we find the Powell Duffryn test useful for analyzing whether Douglas's affidavit meets the "fairly traceable" requirement, we recognize that it may not be an appropriate standard in other CWA cases.

effluent limitation or permit provision promulgated by EPA.[25]  We review the issue of whether a plaintiff has stated a claim under the same standard used by the district court:  A claim may not be dismissed unless it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief.  Norman v. Apache Corp., 19 F.3d 1017, 1021 (5th Cir. 1994); Carney v. RTC, 19 F.3d 950, 954 (5th Cir. 1994).

As authority for its position, Cedar Point cites to the following language from our decision in Save Our Community v. U.S.E.P.A., 971 F.2d 1155 (5th Cir. 1992) (per curiam):

> Without the violation of either (1) an effluent standard or limitation under the CWA, or (2) an order issued with respect to these standards and limitations, the district court lacks jurisdiction to act.

Id. at 1162.  With respect to the constituents of Cedar Point's produced water, EPA has only promulgated an effluent limitation on the oil and grease content.[26]  Because Cedar Point's discharges have always complied with this limitation, Cedar Point argues that Sierra Club has failed to state a claim.

---

[25]The parties sometimes mistakenly refer to this issue as "statutory standing."  The thrust of Cedar Point's argument, however, is that Sierra Club has failed to state a claim under the citizen suit provision of the CWA.  "Statutory standing" is an administrative law concept that arises in the context of challenges to agency actions in which a court must determine whether the interest sought to be protected is within the "zone of interests" protected by the relevant statute.  See Association of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153-54 (1970).

[26]40 C.F.R. § 435.42.

Also, Cedar Point contends that Sierra Club has failed to state a claim with respect to the discharges of the other constituents of Cedar Point's produced water separately or for the discharge of produced water as a whole because EPA has not established an applicable effluent limitation or permit for those discharges.  Cedar Point reasons that, because there is no effluent limitation or permit in place for these discharges, there can be no violation of a limitation, as required by Save Our Community.  In support of this contention, Cedar Point notes that the Southern District of Texas has held that the discharge of a pollutant without a permit is not unlawful under the CWA unless EPA has adopted a relevant effluent standard or permit limitation.  United States v. GAF Corp., 389 F. Supp. 1379, 1386 (S.D. Tex. 1975).  Cedar Point emphatically asserts that this interpretation represents the way that Congress intended the CWA to work.

We find Cedar Point's arguments to be without merit.  First, Cedar Point urges a result contrary to the plain language of the CWA.  As we noted in Save Our Community, the citizen suit provision of the CWA states that:

> [A]ny citizen may commence a civil action on his own behalf . . . against any person . . . who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation . . . .

33 U.S.C. § 1365(a)(1).  The term "effluent standard or limitation," however, is expanded in a later subsection:

25

> For purposes of this section, the term
> "effluent standard or limitation under this
> chapter" means (1) effective July 1, 1973, an
> unlawful act under subsection (a) of section
> 1311 of this title . . . .

33 U.S.C. § 1365(f). Section 1311(a) provides:

> Except as in compliance with this section
> and sections 1312, 1316, 1317, 1328, 1342,
> and 1344 of this title, the discharge of any
> pollutant by any person shall be unlawful.

33 U.S.C. § 1311(a). Among those sections listed for which compliance is necessary to make the discharge of a pollutant lawful, § 1342 provides for NPDES permits that regulate the discharge of pollutants. Therefore, the discharge of any pollutant without a NPDES permit is an unlawful act under § 1311(a). The Supreme Court has interpreted § 1311 and § 1342 in this way. City of Milwaukee v. Illinois, 451 U.S. 304, 310-11 (1981) ("[I]t is illegal to discharge pollutants into the Nation's waters except pursuant to a permit."). Reading these sections together with § 1365(a) and (f), it is clear that a citizen may bring an action under the CWA against any person who is allegedly discharging a pollutant without a NPDES permit.

We agree with Cedar Point that Congress initially intended that a citizen suit based on a violation of § 1311(a) for discharging pollutants without a permit would only lie where EPA had issued a relevant effluent limitation or permit; that is, where the defendant was discharging pollutants without a permit because he had failed to obtain a permit that was available, rather than because EPA had failed to issue such permits. This

26

intent is clearly established by the inclusion of particular dates in the statute, as explained by the legislative history.

First, the citizen suit provision states that a citizen may bring an action against a person allegedly committing an unlawful act under § 1311(a) "effective July 1, 1973."  33 U.S.C. § 1365(f)(1).  The CWA was enacted on October 18, 1972.  Federal Water Pollution Control Act Amendments of 1972, Pub. L. No. 92-500, 86 Stat. 816 (1972).  The legislative history expressly states that Congress delayed the availability of a citizen suit based on an allegedly unlawful act under § 1311(a) in order to give EPA and the states time to issue all of the permits required by the CWA.[27]  Of course, EPA and the states have yet to achieve this ambitious goal.  Nevertheless, Congress has not amended the statute to account for the fact that, since July 1, 1973, numerous entities have violated § 1311(a) by discharging pollutants without a permit because EPA and the states have not issued the necessary permits.

---

[27]    Authority granted to citizens to bring enforcement actions under this section is limited to effluent standards or limitations established administratively under the Act. Such standards or limitations are defined in subsection (f) of [§ 1365] to include the enforcement of an unlawful discharge under [§ 1311(a)], effective after July 1, 1973. By limiting the effective date of citizens suits for violation of this provision the Committee believes sufficient time is available for the State and Federal governments to develop fully, and execute the authority contained in [§ 1342, which provides for NPDES permits].

S. Rep. No. 414, 92d Cong., 1st Sess. 81 (1971) (emphasis added).

In a similar vein, § 1342(k) provides that:

> Until December 31, 1974, in any case where a permit for discharge has been applied for pursuant to this section, but final administrative disposition of such application has not been made, such discharge shall not be a violation of (1) section 1311, 1316, or 1342 of this title, or (2) section 407 of this title, unless the Administrator or other plaintiff proves that final administrative disposition of such application has not been made because of the failure of the applicant to furnish information reasonably required or requested in order to process the application.

33 U.S.C. § 1342(k). Again, the purpose of this provision was to provide a "liability shield" to dischargers for a limited time so that they would not be exposed to legal action because of administrative delays in implementing the permit provisions of the CWA; apparently, Congress expected all permit applications to be processed by December 31, 1974. For example, in the House debates on the conference report, Representative Clark commented:

> Section 402(k) states that until December 31, 1974, a discharge shall not be in violation of law if a permit has been applied for, and the applicant has furnished all information reasonably required or requested. Hopefully, the program will be in the hands of the States by December 31, 1974, and permits will be issued. <u>But, if not, Congress may have to extend this date.</u>

1 <u>A Legislative History of the Water Pollution Control Act Amendments of 1972</u> 274 (Environmental Policy Div., Congressional Research Serv. ed., 1973) (House consideration of the conference report) (emphasis added). As with § 1365(f)(1), however, Congress has not extended the availability of this liability shield beyond its original expiration date, despite the fact that

applications for permits are continually filed and many remain pending.

The result of Congress's failure to extend these exceptions for cases of administrative delay or default is that, "[u]nless the Administrator issues an NPDES permit, `the discharge of any pollutant by any person [is] unlawful [under § 1311(a)].'" National Wildlife Fed'n v. Gorsuch, 693 F.2d 156, 165 (D.C. Cir. 1982); see also Natural Resources Defense Council, Inc. v. Costle, 568 F.2d 1369, 1375 (D.C. Cir. 1977) ("[T]he Administrator has discretion either to issue a permit or to leave the discharger subject to the total proscription of [§ 1311].").  As stated previously, the CWA explicitly provides that a citizen may sue persons allegedly committing unlawful acts under § 1311(a).  33 U.S.C. § 1365(f)(1).  Therefore, a citizen may bring an action against a person allegedly discharging a pollutant without a permit, even if the discharger's illegal behavior results from EPA's failure or refusal to issue the necessary permit.

This result is supported by Supreme Court precedent involving an analogous administrative default in the context of an environmental enforcement action.  General Motors Corp. v. United States, 496 U.S. 530 (1990).  General Motors involved a state implementation plan ("SIP") that regulated emissions from automobile painting operations under the Clean Air Act ("CAA"). Id. at 534.  The original SIP required General Motors to comply fully with certain emission limits by December 31, 1985.  Id. at

29

535. One day before this deadline passed, the state submitted to EPA a proposed revision of the SIP that would have extended the compliance deadline to summer 1987. Id. The CAA authorizes a state to propose a revised SIP and requires EPA to approve the revised SIP if it meets certain statutory requirements. Id. at 533. EPA did not act on the proposed SIP revision until September 4, 1988. Id. In the meantime, however, EPA filed an enforcement action against General Motors on August 17, 1987, alleging that General Motors violated the compliance deadline contained in the old SIP. Id.

On appeal, General Motors contended that EPA could not, on the one hand, bring an enforcement action for violation of the original compliance deadline, while at the same time unreasonably delay acting on a proposal to extend that deadline. Id. at 540. The Court rejected this argument:

> There is nothing in the statute that limits EPA's authority to enforce the [existing SIP] solely to those cases where EPA has not unreasonably delayed action on a proposed SIP revision. Moreover, we find it significant that Congress expressly enacted an enforcement bar elsewhere in the statute. See § 113(d)(10); 42 U.S.C. § 7413(d)(10) (1982 ed.) ("During the period of the order . . . no Federal enforcement action pursuant to this section and no action under section 304 of this Act shall be pursued against such owner . . . ."). The fact that Congress explicitly enacted an enforcement bar similar to the one proposed by petitioner in one section of the statute, but failed to do so in the section at issue in this case reinforces our refusal to import such a bar here.

Id. at 541 (citations omitted).

Our analysis of the citizen suit provision of the CWA tracks the Court's reasoning in General Motors. Nothing in the CWA limits a citizen's right to bring an action against a person who is allegedly discharging a pollutant without a permit solely to those cases where EPA has promulgated an effluent limitation or issued a permit that covers the discharge. We note that Congress did explicitly enact limitations on citizen suits for the purpose of protecting putative defendants whose violations could be attributed to administrative delay in promulgating regulations; however, these limitations have expired by their own terms. 33 U.S.C. §§ 1342(k), 1365(f)(1). Further, although these limitations may have been based on unrealistic expectations regarding EPA's ability to carry out fully its statutory mandate, it is significant that Congress has not in twenty-three years amended these sections to conform to the realities of EPA's regulatory burden and the attendant administrative delay. Therefore, while Congress's original intent may have been to limit citizen suits based on unpermitted discharges to those instances where an applicable permit was available from the state or EPA, Congress's subsequent inaction evinces an intent to allow such citizen suits even where the discharger's failure to obtain a permit can be explained by administrative default.

We are also not convinced that other courts have qualified the right to sue a person allegedly discharging pollutants without a permit by limiting that right to situations where EPA has promulgated a relevant effluent limitation or permit. The

31

only authority that Cedar Point can cite for this proposition is the district court opinion in GAF Corp., which we find to have little persuasive value. First, the language in GAF Corp. cited by Cedar Point is dicta. Also, GAF Corp. involved a suit for injunctive relief by the government, rather than a citizen suit for damages; the court may have found it inequitable to allow the government to sue when it had not promulgated regulations to guide the defendant's behavior. Yet, even with respect to actions brought by the government, this language in GAF Corp. has been criticized. In United States v. Frezzo Bros., Inc., 602 F.2d 1123 (3rd Cir. 1979), cert. denied, 444 U.S. 1074 (1980), the Third Circuit specifically rejected GAF Corp.'s interpretation of the CWA:

> We see nothing impermissible with allowing the Government to enforce the Act by invoking § 1311(a), even if no effluent limitations have been promulgated for the particular business charged with polluting. Without this flexibility, numerous industries not yet considered as serious threats to the environment may escape administrative, civil, or criminal sanctions merely because the EPA has not established effluent limitations. Thus, dangerous pollutants could be continually injected into the water solely because the administrative process has not yet had the opportunity to fix specific effluent limitations. Such a result would be inconsistent with the policy of the Act.
> We do not believe, as did the court in GAF, that the permit procedure urged by the government is unduly burdensome on business.

Frezzo Bros., 602 F.2d at 1128.

Moreover, we have held that obtaining a permit is a requirement separate and distinct from the requirement that a

32

discharger comply with any applicable effluent limitations. <u>Carr. v. Alta Verde Indus., Inc.</u>, 931 F.2d 1055, 1060 n.3 (5th Cir. 1991). Indeed, numerous courts have allowed suits by citizens against persons allegedly discharging pollutants without a permit, despite the fact that the discharger was complying with applicable effluent limitations or that no applicable effluent limitation was in place. <u>See, e.g.</u>, <u>Concerned Area Residents for Env't v. Southview Farm</u>, 34 F.3d 114, 117 (2nd Cir. 1994), <u>cert. denied</u>, 115 S. Ct. 1793 (1995); <u>Carr</u>, 931 F.2d at 1061; <u>Menzel v. County Utils. Corp.</u>, 712 F.2d 91, 94 (4th Cir. 1983); <u>Washington Wilderness Coalition v. Hecla Min. Co.</u>, 870 F. Supp. 983, 986 (E.D. Wash. 1994); <u>Hawaii's Thousand Friends, Life of the Land, Inc. v. City and County of Honolulu</u>, 806 F. Supp. 225, 230 (D. Hawaii 1992); <u>Hudson River Fishermen's Ass'n v. County of Westchester</u>, 686 F. Supp. 1044, 1050 (S.D.N.Y. 1988); <u>O'Leary v. Moyer's Landfill, Inc.</u>, 523 F. Supp. 642, 646 (E.D. Pa. 1981).

Finally, EPA itself, whose expertise in enforcing the CWA is entitled to some deference,[28] has recognized that citizens have the right to sue "Coastal Subcategory" operators who are discharging produced water without a permit. 57 Fed. Reg. 60,926, 60,944-45 (1992). At the time EPA made this statement, it had never issued such permits and had only issued effluent limitations on the oil and grease content of produced water.

---

[28]We generally give deference to an agency's interpretation of a statute that it administers. <u>Kershaw v. Resolution Trust Corp.</u>, 987 F.2d 1206, 1208 (5th Cir. 1993).

Accordingly, we hold that Sierra Club has stated a claim under the citizen suit provision of the CWA.

### 3. Violation of the CWA

Cedar Point's third argument on appeal is that the district court erred in granting Sierra Club's motion for partial summary judgment on the issue of whether Cedar Point's discharges of produced water violated the CWA.  We review the granting of summary judgment de novo, applying the same criteria used by the district court in the first instance.  Norman v. Apache Corp., 19 F.3d 1017, 1021 (5th Cir. 1994); Conkling v. Turner, 18 F.3d 1285, 1295 (5th Cir. 1994).  First, we consult the applicable law to ascertain the material factual issues.  King v. Chide, 974 F.2d 653, 655-56 (5th Cir. 1992).  We then review the evidence bearing on those issues, viewing the facts and inferences to be drawn therefrom in the light most favorable to the nonmoving party.  Lemelle v. Universal Mfg. Corp., 18 F.3d 1268, 1272 (5th Cir. 1994); FDIC v. Dawson, 4 F.3d 1303, 1306 (5th Cir. 1993), cert. denied, 114 S. Ct. 2673 (1994).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Cedar Point maintains that the discharge of produced water without a permit does not violate the CWA because the statute

only prohibits the discharge of a "pollutant," and, it argues, neither produced water nor any of its constituents is a pollutant within the meaning of the CWA. First, Cedar Point contends that its produced water and the components thereof are not pollutants "per se" because they are not specifically enumerated in the CWA's definition of "pollutant." That provision states:

> The term "pollutant" means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water. This term does not mean (A) "sewage from vessels" within the meaning of section 1322 of this title; or (B) water, gas, or other material which is injected into a well to facilitate production of oil or gas, or water derived in association with oil or gas production and disposed of in a well, if the well used either to facilitate production or for disposal purposes is approved by authority of the State in which the well is located, and if such State determines that such injection or disposal will not result in the degradation of ground or surface water resources.

33 U.S.C. § 1362(6). Cedar Point then argues that courts may not expand this definition to include substances not explicitly listed, citing as authority National Wildlife Fed'n v. Gorsuch, 693 F.2d 156 (D.C. Cir. 1982). In this opinion, the court noted its reservations about adding terms to the definition of pollutant because "Congress used restrictive phrasing--`[t]he term "pollutant" means dredged spoil, [etc.]'--rather than the looser phrase `includes,' used elsewhere in the Act." Id. at 171-72. The court elaborated that the use of the term "means"

35

indicates an intent to exclude any meaning not expressly stated. Id. at 172 (citing Colautti v. Franklin, 439 U.S. 379, 392 n.10 (1979)).

Further, the court relied on the legislative history of the CWA in determining that "Congress did not intend the term `pollutant' to be all inclusive." Id. at 173. The court pointed out that the purpose of listing specific items in the definition was "so that litigable issues are avoided over the question of whether the addition of a particular material is subject to control requirements." Id. (quoting S. Rep. No. 414, 92d Cong., 1st Sess. 76 (1971) (internal quotation omitted)). Also, the court noted that earlier draft versions of the CWA used more inclusive phrasing: "The term `pollutant' means, but is not limited to, dredged spoil, . . ., and industrial, municipal, agricultural, and other waste discharged into water." Id. (quoting H.R. 11,896, 92d Cong., 2d Sess. § 502(6) (1972) (emphasis added) (internal quotation omitted) and citing S. 2770, 92d Cong., 1st Sess. § 502(f) (1971)). The conference committee deleted the more inclusive phrases "but is not limited to" and "other waste," but offered no explanation for the change. Id. (citing S. Rep. No. 1236 (Conf. Rep.), 92d Cong., 2d Sess. 143-44 (1972)).

Cedar Point concedes that a discharged substance may still be subject to regulation under the CWA even though it is not specifically listed in the definition of pollutant; however, Cedar Point contends that only EPA, and not the courts, may make

the determination that a "non-listed" substance is a pollutant. Again, Cedar Point relies principally on National Wildlife Fed'n v. Gorsuch. In its review of the legislative history of the CWA, the court found "strong signals" that Congress "entrusted EPA with at least some discretion over which `pollutants' and sources of pollutants were to be regulated under the NPDES program." Id. at 173. First, the court recognized a general intent to give EPA "substantial discretion" in interpreting the CWA:

> In the administration of the Act, EPA will be required to establish numerous guidelines, standards and limitations. . . . [T]he Act provides Congressional guidance to the Administrator in as much detail as could be contrived. Virtually every action required of the Administrator by the Act, however, involves some degree of agency discretion, judgments involving a complex balancing of factors that include technological considerations, economic considerations, and others.

Id. at 173 (quoting S. Rep. No. 1236 (Conf. Rep.), 92d Cong., 2d Sess. 149 (1972)). The court then quoted Senator Muskie's comments, made during a debate over the Senate version of the CWA, as evidence of a specific intent to give EPA discretion in defining what constitutes a pollutant:

> Again, I do not get into the business of defining or applying these definitions to particular kinds of pollutants. That is an administrative decision to be made by the Administrator. Sometimes a particular kind of matter is a pollutant in one circumstance, and not in another.

Id. at 173-74 (quoting 117 Cong. Rec. 38,838 (1971)).

Cedar Point argues that Senator Muskie's comments in particular make it clear that only EPA may define what

constitutes a pollutant under the CWA.  First, Cedar Point notes that the above language expressly commits the definitional question to the Administrator of the EPA.  Also, Cedar Point emphasizes Senator Muskie's statement that a substance may be a pollutant in some situations and not in others.  Specifically, Cedar Point contends that whether a substance is a pollutant depends upon, <u>inter</u> <u>alia</u>, the quantity in which it is discharged, the characteristics of the receiving waters, and the proportion of the amount of the substance in the discharge to the amount that exists in nature.  For example, a substance may be very harmful when discharged in large quantities into a fresh water stream, but may have no measurable effect when a smaller quantity is discharged into a salt water bay.  EPA takes these factors into account when promulgating effluent limitations and issuing NPDES permits.  Therefore, Cedar Point argues, EPA defines a substance as a pollutant by prohibiting its discharge at certain levels through an effluent limitation or a permit.  Stated differently, if EPA has not regulated the discharge of a substance in an effluent limitation or a permit <u>applicable to</u> <u>that discharge</u>, that substance is not a pollutant <u>in the context</u> <u>of that discharge</u>.  Accordingly, Cedar Point maintains that it is not discharging a pollutant in violation of the CWA because:  (1) neither produced water nor any of its constituents is specifically listed under the CWA's definition of a pollutant; (2) EPA has not promulgated an effluent limitation or issued a permit that regulates Cedar Point's produced water or any of its

constituents except oil and grease; and (3) Cedar Point has always complied with the effluent limitation on oil and grease.

Finally, Cedar Point advances a policy argument for its position that a court may not determine that a discharged substance is a pollutant where the substance is not specifically listed in the CWA and is not regulated by a limitation or permit applicable to the discharge in question. Cedar Point argues that, if courts are allowed to make such decisions, chaos will result because courts will reach different results regarding what substances are pollutants and at what levels such substances may be discharged without causing harm to the environment.

An analysis of Cedar Point's arguments requires us to engage in a two-step inquiry. First, we must determine whether the CWA allows a court to find that a particular substance is a pollutant where it is not specifically listed under the CWA's definition of a pollutant and EPA has not promulgated an effluent limitation or permit regulating the discharge of the substance. If a court may make such a finding, we must then determine whether Cedar Point's produced water, or any of its constituents, is a pollutant under the CWA.

We begin our analysis with the statute itself.[29] When a litigant's rights turn on whether his conduct falls within the proscriptions of a statute containing terms of art, a court will

---

[29]"When courts interpret statutes, the initial inquiry is the language of the statute itself." Hightower v. Texas Hosp. Ass'n, 65 F.3d 443, 448 (5th Cir. 1995); see also Matter of Stone, 10 F.3d 285, 289 (5th Cir. 1994).

naturally seek guidance on the meanings of those terms by reference to definitions provided in the statute. As stated above, the CWA defines the term "pollutant" as "meaning" a list of various items and "not meaning" a couple of discrete substances. 33 U.S.C. § 1362(6). We do not disagree with the D.C. Circuit's assessment that the use of the word "means" manifests an intent to restrict the definition of pollutant to the terms listed. National Wildlife Fed'n v. Gorsuch, 693 F.2d at 172. As that court recognized, however, the breadth of many of the items in the list of "pollutants" tends to eviscerate any restrictive effect. See id. at 173 n.52. Characterizing the list as "haphazard," the court noted that it contains materials as specific as "`cellar dirt' (but not `dirt' as such) and as general as `industrial, municipal, and agricultural wastes.'" Id. at 174 n.56. It is scarcely disputable that many substances discharged into the waters of the United States could be characterized as "industrial waste," or even as "chemical waste," another listed material. Therefore, the statutory definition of pollutant at least appears to invite the inclusion of discharged substances that are not specifically listed into these broad categories. Otherwise, these terms would be meaningless; that is, there would be no such thing as "industrial waste" because any such discharge could always be described in more specific terms that are not listed in the statute.

As the D.C. Circuit acknowledged, the legislative history of the CWA provides little guidance on how inclusive Congress

40

intended the definition of pollutant to be. Id. at 173 n.52.

For example, although Congress clearly stated that the rationale

for listing pollutants was to avoid "litigable issues" over

whether a particular material is subject to the statute, the

inclusion in the list of such imprecise terms as "industrial,

municipal, and agricultural waste" generates more litigable

issues than it resolves. Id. Also, while the conference

committee's elimination of the phrases "but not limited to" and

"other waste" from the definition of pollutant may be interpreted

as an attempt to limit the scope of the definition, the committee

did not explain the change. Id. at 173. Further, we think that

the retention of such broad terms in the definition suggests that

the committee may have determined that the eliminated phrases

were simply redundant. For instance, a list that includes "solid

waste," "chemical wastes," "biological materials," "radioactive

materials," and "industrial, municipal, and agricultural waste"

hardly needs to be amplified by the phrase "other waste."

Finally, the D.C. Circuit noted that the House Report is "of

little help in determining how inclusive Congress meant the term

`pollutant' to be" because it does not discuss particular terms

within the definition. Id. at 173 n.52.

In addition, one commentator has suggested that the CWA's

definition of pollutant is considerably inclusive:

> This laundry list of "bads" endorses an
> understanding of a pollutant as a "resource
> out of place." The congressional purpose was
> to identify expansively and anticipate all
> the physical "stuff" that could end up in the

41

wrong place to the detriment of water
quality. . . .

Despite the absence of an indisputable
catch-all (e.g., "any other waste whatever"),
there is little doubt that the recitation of
categories in the definition of "pollutant"
is designed to be suggestive not exclusive.
In the 1972 amendments, Congress meant to
carry on the tradition of the Refuse Act, and
that tradition was to construe the word
"refuse" as condemning each and every
variation of damage-inducing wastes that
changing technologies could invent.  This
interpretation is endorsed by United States
v. Hamel, [551 F.2d 107 (6th Cir. 1977),]
which condemns a discharge of gasoline as
within a generic understanding of
"pollutant," rather than stretch the less
inclusive "biological materials" to cover
organically-based petroleum compounds.

That the definition of "pollutant" is
meant to leave out very little is confirmed
by the statutory definition of "pollution,"
which means nothing less than the "man-made
or man-induced alteration of the chemical,
physical, biological, and radiological
integrity of water."  [33 U.S.C. § 1362(19).]

2 William H. Rodgers, Jr., Environmental Law: Air and Water 144
(1986).

Given these observations, it seems clear that, while the
listing of a specific substance in the definition of pollutant
may be significant,[30] the fact that a substance is not
specifically included does not remove it from the coverage of the
statute.  The next question, then, is who makes the determination
that a substance that is not listed fits into the definition.
Cedar Point argues that only EPA may make such a determination,
to the exclusion of the courts.

_____

[30]Indeed, if a person were to be so bold as to discharge
"cellar dirt," he could hardly be heard to complain when the full
force of the CWA was brought upon him.

42

As an initial matter, we note that only in rare circumstances will a court be called upon to decide in a citizen suit whether a particular substance is a pollutant. Typically, citizen suits are brought against persons who are violating effluent limitations or permits issued by EPA. In such cases, the question of whether the discharged substance is a pollutant is not in issue because EPA will have already made that determination through the effluent limitation or permit.[31] As our earlier discussion confirms, however, a citizen may also bring an action against a person that is discharging an alleged pollutant without a permit even where EPA has failed to issue a permit or promulgate an effluent limitation to cover the discharge. In these cases, EPA will necessarily have not made a determination that the discharged substance is a pollutant. Therefore, logic dictates that the court must be able to decide whether the discharged substance is a pollutant in order to determine whether the defendant is violating the statute. It would make little sense to allow a citizen to bring an action that the court could not adjudicate.[32] We find that this logic

---

[31]If the discharger disputed EPA's determination that a particular substance was a pollutant, its recourse would be to seek judicial review of the determination. In such a case, the court would not be deciding whether a particular substance was a pollutant, but rather whether EPA's determination was a reasonable interpretation of the statute. See, e.g., National Wildlife Fed'n v. Gorsuch, 693 F.2d at 174 n.56.

[32]This logical flaw could be avoided by characterizing the question of whether a substance is a pollutant as part of stating a claim; that is, by requiring the citizen to demonstrate as an element of his claim that the defendant is discharging a pollutant. Such a characterization is plausible, given that the

43

compels a holding that a court may determine in a citizen suit whether a discharged substance is a pollutant, notwithstanding the fact that EPA has failed to issue a permit or to promulgate an effluent limitation that regulates the discharge.

Cedar Point does not direct us to any statutory authority to the contrary. First, we note that neither the statute nor the legislative history expressly grants EPA the exclusive authority to decide that a substance falls within the statutory definition of pollutant or divests the courts of the same. The D.C. Circuit has interpreted the legislative history of the CWA to mean that Congress has invested EPA with "at least some power" to define the term "pollutant," National Wildlife Fed'n v. Gorsuch, 693 F.2d at 167. While we agree with this assessment, we find no support for the logical leap that this delegation of power necessarily deprives the federal courts of similar authority where EPA has not spoken. It is true that Congress intended EPA to apply the definition of pollutant to particular substances and to regulate those substances through effluent standards and permits. Nevertheless, as explained in our discussion regarding stating a claim, Congress also made it unlawful for a person to discharge a pollutant without a permit even where EPA has not

_____

issue of stating a claim is somewhat intertwined with the question of whether there has been a substantive violation of the CWA. Even under this reading, however, a court would still have to decide whether a substance being discharged was a pollutant in citizen suits where EPA had not issued a permit or effluent limitation.

44

applied the definition to the substance being discharged.  In such a case, the courts must apply the definition.

Further, these rare cases where courts are called upon to determine whether a substance is a pollutant do not require a "complex balancing" of biological, technological and economic factors, such as EPA must undertake when promulgating effluent standards.  That is, the court will not be asked to analyze the level of discharge, the character of the receiving waterway, and the cost of achieving various permit limitations.  Rather, Congress has already set the permit limitation in such cases-- zero discharge.  A court need only apply the statutory definition to determine if the substance in question is a pollutant.  If it determines that the substance is a pollutant, and the defendant is discharging it at all without a permit, then there has been a violation of § 1311(a).  We do not think that this task is beyond the competence of a court.

Cedar Point also fails to direct us to any judicial authority contrary to our holding.  In this regard, we point out that Cedar Point's reliance on National Wildlife Fed'n v. Gorsuch for this proposition is misplaced.  The court's reservations regarding adding terms to the statute did not arise in the context of it being asked to add those terms.  Rather, the court was reviewing a decision by EPA not to regulate through a permit the low dissolved oxygen, cold, and supersaturation caused by dams.  Id. at 171.  The court expressly stated that it was not deciding whether the definition of pollutant necessarily excluded

those elements, but only whether EPA could so interpret the definition.  Id. at 174 n.56.

Moreover, our holding breaks no new ground in the case law. Rather, it is consistent with numerous CWA cases in which courts have made an independent determination that a particular substance is a pollutant without reference to any applicable effluent standard or permit limitation.  See, e.g., Concerned Area Residents for Env't v. Southview Farm, 34 F.3d 114, 117 (2nd Cir. 1994) (finding that liquid manure is a pollutant because definitional list includes solid waste, sewage, biological materials, and agricultural waste), cert. denied, 115 S. Ct. 1793 (1995); United States v. Plaza Health Labs., Inc., 3 F.3d 643, 645 (2nd Cir. 1993) (finding that human blood is a pollutant because definitional list includes biological materials), cert. denied, 114 S. Ct. 2764 (1994); United States v. Schallom, 998 F.2d 196, 199 (4th Cir.) (finding that "shotcrete" and cement are pollutants because definitional list includes solid waste, chemical waste, and sand), cert. denied, 114 S. Ct. 277 (1993); National Wildlife Fed'n v. Consumers Power Co., 862 F.2d 580, 583 (6th Cir. 1988) (finding that dead fish and fish remains are pollutants because definitional list includes biological materials); United States v. M.C.C. of Florida, Inc., 772 F.2d 1501, 1505-06 (11th Cir. 1985) (finding that redeposited vegetation and sediment are pollutants because definitional list includes dredged spoil), vacated and remanded on other grounds, 481 U.S. 1034 (1987); United States v. Hamel, 551 F.2d 107, 110

46

(6th Cir. 1977) (finding that gasoline is a pollutant because generic terms of definitional list evince congressional intent to encompass substances covered under the Refuse Act of 1899, and Supreme Court had held that gasoline was covered by the earlier statute); Higbee v. Starr, 598 F. Supp. 323, 330 (E.D. Ark. 1984) (finding that hog waste is a pollutant because definitional list includes agricultural waste), aff'd, 782 F.2d 1048 (8th Cir. 1985).[33]  The fact that courts have been making these determinations since the enactment of the CWA tends to deflate Cedar Point's concerns that the exercise this authority will result in chaos.

Having held that we have the authority in a citizen suit under the CWA to determine whether a discharged substance is a pollutant, we now turn to the question of whether Cedar Point's produced water, or any of its constituents, is a pollutant under the CWA.  Examining the statutory definition of pollutant first, we think that produced water is clearly subsumed by the phrases "chemical wastes" and "industrial waste."  33 U.S.C. § 1362(6). The exclusions under this definition also provide some guidance. Specifically, the definition states that the term "pollutant" does not mean

> water derived in association with oil or gas
> production and disposed of in a well, if the

---

[33]We recognize that some of these cases are not completely analogous to the case sub judice because they involve civil or criminal enforcement actions brought by the government; however, we see no reason why a court may determine that a substance is a pollutant in such cases but may not make that determination in a citizen suit.

> well used . . . for disposal purposes is
> approved by authority of the State in which
> the well is located, and if such State
> determines that such injection or disposal
> will not result in the degradation of ground
> or surface water resources.

33 U.S.C. § 1362(6)(B).[34] Although this exclusion of produced water from the meaning of pollutant in very limited circumstances does not necessarily mean that produced water is a pollutant under all other circumstances,[35] we nevertheless consider it a strong indicator of Congress's concern over the effects of produced water on the environment. Furthermore, if Congress felt that it was necessary to draft a detailed exemption for produced water that has been disposed of in a state-approved reinjection

---

[34]Inexplicably, neither party brought this provision to our attention. This failure is all the more remarkable because this provision is the unmistakable fingerprint of the oil and gas industry on the CWA -- in the definition of "pollutant" no less.

[35]But cf. United States Steel Corp. v. Train, 556 F.2d 822 (7th Cir. 1977). In this case, U.S. Steel challenged EPA's authority to regulate its disposal of acid wastes in a well. Id. at 851. With respect to whether the acid wastes were a pollutant, the court quoted the exemption in § 1362(6)(B) and stated:

> Applying the canon expressio unius est
> exclusio alterius to the quoted language, we
> conclude that the listed materials are
> "pollutants" when injected into wells under
> any other circumstances.

Id. at 852. We do not apply that canon here. The legislative history makes clear that Congress was distinguishing between the disposal of produced water into wells by the oil industry and the disposal of other materials into wells by other industries, rather than between the disposal of produced water into wells and the disposal of produced water by other means. 1 A Legislative History of the Water Pollution Control Act Amendments of 1972 589-97 (Environmental Policy Div., Congressional Research Serv. ed., 1973) (House debate on amendment offered by Rep. Aspin that would have eliminated the exemption).

well, it may be that Congress believed that such produced water would otherwise be a pollutant. If, absent an exemption, produced water reinjected into a state-approved well is a pollutant, then it is hardly a stretch to say that produced water deposited directly into a bay is also a pollutant.[36]

Aside from this statutory support, we also find substantial guidance from EPA on the question of whether Cedar Point's produced water is a pollutant. As we noted in our discussion of stating a claim under the CWA, EPA has recognized that citizens have the right to sue "Coastal Subcategory" operators who are discharging produced water without a permit. 57 Fed. Reg. 60,926, 60,944-45 (1992). The ability to bring such an action necessarily implies that produced water is a pollutant. In addition, EPA has issued permits regulating produced water discharges by oil and gas operators in the "Onshore Subcategory" and the "Offshore Category" in Texas. 56 Fed. Reg. 7698 (1991); 46 Fed. Reg. 20,284 (1981). In these permits, EPA has explicitly referred to produced water as a "pollutant." See, e.g., 56 Fed. Reg. 7698, 7701 (1991) ("[T]he permits prohibit the discharge of all wastewater pollutants from Onshore Subcategory facilities, including . . . produced water." (emphasis added)). Finally, several of the components of Cedar Point's produced water, including benzene, naphthalene, and zinc, are listed as "toxic

_____

[36]We also think it significant that, although Congress provided this clear avenue for oil and gas producers to avoid regulation by the CWA, Cedar Point chose not to avail itself of it.

pollutants" in regulations promulgated by EPA.  40 C.F.R. § 401.15 (1994); cf. Daque v. City of Burlington, 732 F. Supp. 458, 469-70 (D. Vt. 1989) (finding substances discharged by defendants to be pollutants by reference to the toxic pollutant list).  Similarly, oil and grease are listed as "conventional pollutants."  40 C.F.R. § 401.16 (1994).

Given this support in the statute, as reinforced by EPA's own regulations, we conclude that Cedar Point's produced water is a pollutant within the meaning of the CWA.[37]  Cedar Point does not dispute that it discharged this produced water into Galveston Bay without a NPDES permit.  Accordingly, we conclude that the district court correctly held that Cedar Point violated § 1311(a) of the CWA.

## 4.  Striking of Cedar Point's Experts

Cedar Point's fourth argument on appeal is that the district court erred in striking Cedar Point's designation of experts and excluding them from testifying at trial as a sanction for

---

[37]We recognize that the overwhelming evidence from the statute and the regulations makes our determination that produced water is a pollutant an easy one.  We note, however, that the conditions that give rise to the need for a court to determine whether a substance is a pollutant may lead to more difficult cases.  Where EPA has not promulgated a permit or limitation for a particular discharge, it may be because EPA lacks the resources to do so or because the discharge is not a priority.  Occasionally, however, it may be because EPA questions whether the discharged substance is a pollutant at all.  In such a case, it is likely that the substance may not clearly fit within the statutory definition and that there will be little regulatory guidance from EPA.  In a citizen suit brought under these circumstances, courts should exercise restraint to avoid stretching the term "pollutant" too far.

violating the court's accelerated discovery order. In this regard, we are asked to review two separate determinations by the district court: (1) whether Cedar Point actually violated the discovery order; and (2) if there was a violation, whether the striking of Cedar Point's experts was an appropriate sanction. We review the court's finding that Cedar Point violated the discovery order for an abuse of discretion. See Scott v. Monsanto Co., 868 F.2d 786, 793 (5th Cir. 1989) (district court's rulings on discovery matters will only be reversed for abuse of discretion). We apply the same standard in reviewing a sanction for violating a discovery order. Chilcutt v. United States, 4 F.3d 1313, 1320 (5th Cir. 1993), cert. denied, 115 S. Ct. 460 (1994).[38] The district court's discretion in such matters has been described as "broad", id.; Landry v. Air Line Pilots Ass'n Int'l AFL-CIO, 901 F.2d 404, 436 n.114 (5th Cir.), cert. denied, 498 U.S. 895 (1990), and "considerable", Murphy v. Magnolia Elec. Power Ass'n, 639 F.2d 232, 234 (5th Cir. 1981). Accordingly, "[i]t is unusual for an appellate court to find abuse of

---

[38]But see Alldread v. City of Grenada, 988 F.2d 1425, 1436 (5th Cir. 1993). Alldread applied a "manifest error" standard in reviewing a trial court's exclusion of expert testimony as a sanction for failing to comply with a discovery order. As authority for this proposition, the Alldread court cited Page v. Barko Hydraulics, 673 F.2d 134, 139 (5th Cir. 1982). Page, however, involved an evidentiary ruling on the admissibility of an expert's testimony at trial. It is true that the exclusion of expert testimony as an evidentiary matter is reviewable for manifest error. United States v. Willey, 57 F.3d 1374, 1389 (5th Cir. 1995), cert. denied, 1995 WL 668887 (U.S. Dec. 11, 1995). When expert testimony is excluded as a sanction, however, we review the trial court's ruling for abuse of discretion. Chilcutt, 4 F.3d at 1320; Bradley v. United States, 866 F.2d 120, 124 (5th Cir. 1989).

discretion in these matters."  O'Malley v. United States Fidelity and Guar. Co., 776 F.2d 494, 499 (5th Cir. 1985).  Generally, we will only reverse the trial court's discovery rulings in "unusual and exceptional case[s]."  Id. (quoting Brown v. Thompson, 430 F.2d 1214, 1216 (5th Cir. 1970) (internal quotations omitted)).

Immediately after Sierra Club filed its complaint on April 20, 1993, the district court entered an order setting an accelerated discovery schedule for this case, rather than proceeding under a traditional discovery plan.[39]  The order first required the parties to make certain "initial disclosures" without waiting for discovery requests.  These initial disclosures were to include copies of "all documents, data compilations, and tangible things . . . that are likely to bear significantly on any claim or defense."

In addition to these disclosures, the court's order required the parties to make disclosures regarding the expert testimony that they intended to present at trial.  With respect to each expert witness, each party had to submit to the other the following:

> a written report prepared and signed by the
> witness which includes a complete statement
> of all opinions to be expressed and the basis
> and reasons therefor; the data or other
> information relied upon in forming such
> opinions; any exhibits to be used as a

[39]The authority for such an order is found in paragraph 6 of the Cost and Delay Reduction Plan under the Civil Justice Reform Act of 1990, 28 U.S.C. §§ 471-482, as adopted by the Southern District of Texas on October 24, 1991.  The order tracks the language of the new Rule 26(a) of the Federal Rules of Civil Procedure, with slight modifications.

> summary of or support for such opinions; the
> qualifications of the witness; and a listing
> of any other cases in which the witness has
> testified as an expert at trial or in
> deposition within the preceding four years.

The order required the parties to submit these reports ninety

days prior to the trial date.[40]  The order appears to call for

"simultaneous" disclosure of the reports; that is, the order did

not direct one party to submit its reports first, but only

required each party's reports to be submitted by the ninety-day

deadline.[41]  After this deadline, the order allowed the parties

to make additional expert submissions in only two situations.

First, the parties could submit reports "to contradict or rebut

evidence on the same subject matter identified by another party"

in its initial expert disclosures.  The order directed that such

a report be made within thirty days after the disclosure of the

report being rebutted.  Second, the parties had a duty to

---

[40]In a telephone conference on September 29, 1993, the district court set this case for trial-docket call on May 2, 1994; accordingly, the expert disclosure deadline fell on February 1, 1994.

[41]The Advisory Committee Notes to Rule 26 recommend disclosure of these reports seriatim, but leave such a decision to the discretion of the trial court:

> [I]n most cases the party with the burden of
> proof on an issue should disclose its expert
> testimony on that issue before other parties
> are required to make their disclosures with
> respect to that issue.  In the absence of
> such a direction, the disclosures are to be
> made by all parties at least 90 days before
> the trial date or the date by which the case
> is to be ready for trial . . . .

Fed. R. Civ. P. 26 advisory committee's note.

supplement these reports if necessary.[42]  Such supplementation

was required to be made at least thirty days prior to trial.[43]

On January 24, 1994, Cedar Point filed a corrected

designation of its expert witnesses:  Don Harper, Carl

Oppenheimer, John McGowan, and Stanley Pier.  Two days later,

Cedar Point supplemented this list with the designation of Joe

Haney.  Cedar Point served the required reports from these

experts around the deadline set by the court's order.[44]  Cedar

Point later timely served Sierra Club with "rebuttal" expert

reports from Don Harper, John McGowan, and Stanley Pier.

---

[42]The scope of this duty to supplement is outlined in Rule
26(e).  Specifically, a party is required to supplement its
expert disclosures if the court so orders or if "the party learns
that in some material respect the information disclosed is
incomplete or incorrect and if the additional or corrective
information has not otherwise been made known to the other
parties during the discovery process or in writing."  Fed. R.
Civ. P. 26(e)(1).

[43]Rule 26(e)(1) requires that supplementation of expert
disclosures be made by the time the supplementing party's
"Pretrial Disclosures" are due.  Fed. R. Civ. P. 26(e)(1).  The
court's accelerated discovery order directed that the "Pretrial
Disclosures" would be due at least thirty days before trial.

[44]Cedar Point maintains that its submission of expert
reports was timely, citing as evidence a letter to the Clerk of
the Southern District of Texas that was copied to counsel
opposite.  This letter was a cover letter to the expert reports
and was dated February 2, 1994.  The deadline for service of
these reports, however, was February 1, 1994, ninety days before
the docket-call date of May 2, 1994.  The court's order directed
that the parties serve the reports in accordance with Rule 5 of
the Federal Rules of Civil Procedure.  Assuming that Cedar Point
mailed these reports to Sierra Club, it would have had to do so
by February 1, as Rule 5 provides that service by mail is
complete upon mailing.  Fed. R. Civ. P. 5(b).  In any event,
Sierra Club's motion to strike Cedar Point's experts was not
predicated on a failure to comply with deadlines.

Finally, Cedar Point timely supplemented Don Harper's reports before trial.[45]

On February 14, 1994, Sierra Club filed a motion to strike Cedar Point's designation of experts as a sanction for failure to comply with the court's accelerated discovery order. Specifically, Sierra Club argued that the initial expert reports filed by Cedar Point were so incomplete and insubstantial that they failed to meet the requirements of the discovery order. On April 19, 1994, the court entered an order granting this motion. The court found that Cedar Point had not complied with its order regarding expert reports and ordered that Cedar Point's designation of experts was stricken, with instructions that none of Cedar Point's experts would be allowed to testify at trial.

Cedar Point maintains that, between its initial expert disclosures and its rebuttal and supplementary disclosures, it did provide enough information to comply with the district court's discovery order. Also, Cedar Point asserts that it cannot be sanctioned for failure to comply with a discovery order because Sierra Club never filed a motion to compel. Finally, Cedar Point argues that the sanction of striking Cedar Point's experts was an abuse of discretion. In this regard, Cedar Point contends that: (1) the subject of its experts' testimony--the

---

[45]Cedar Point also filed an untimely supplement to Carl Oppenheimer's report on April 25, 1994; however, Cedar Point's only purpose in doing so was to ensure the inclusion of this report in the record--the district court had already entered an order striking Carl Oppenheimer as a witness a week earlier. Accordingly, we will not consider the untimeliness of this filing in adjudicating Cedar Point's appeal on this issue.

harm caused by Cedar Point's produced water--was crucial to the court's assessment of penalties against Cedar Point; (2) even if Cedar Point's initial expert disclosures were inadequate, there was no prejudice to Sierra Club because Sierra Club received the required information through rebuttal and supplementary disclosures with enough time to prepare for trial; (3) any prejudice to Sierra Club because of untimely disclosures could have been cured through a continuance; and (4) Cedar Point's failure to comply was justified because Sierra Club's complaint and initial disclosures were so vague, general, and irrelevant that the issues in the lawsuit were not sufficiently defined to put Cedar Point on notice of what expert testimony would be needed.

The district court's discovery order required that the parties' <u>initial</u> expert disclosures "include a <u>complete</u> statement of <u>all</u> opinions to be expressed and the basis and reasons therefor" and "the data or other information relied upon in forming such opinions." The Advisory Committee Notes to Rule 26 of the Federal Rules of Civil Procedure state that such reports must be "detailed and complete." Fed. R. Civ. P. 26 advisory committee's note. These Notes also explain that the purpose of the reports is to avoid the disclosure of "sketchy and vague" expert information, as was the practice under the former rule. <u>See</u> <u>id.</u>

The district court's finding that Cedar Point's initial expert disclosures did not meet this standard does not constitute

an abuse of discretion.  A review of the disclosures bears out

this assessment.  Don Harper's statement of opinions and reasons

was a one-and-a-half page outline listing his "points of

testimony."  Carl Oppenheimer offered two one-paragraph

descriptions of his opinions.  Stanley Pier and John McGowan also

provided only one-paragraph statements relating to their

opinions.  Finally, Joe Haney's statement included no substantive

opinions, but only declared what subjects he intended to research

and to discuss at trial.  Although Cedar Point later reinforced

these statements with rebuttal and supplementary disclosures, the

discovery order and Rule 26(a) clearly require that the initial

disclosures be complete and detailed.  The purpose of rebuttal

and supplementary disclosures is just that--to rebut and to

supplement.  These disclosures are not intended to provide an

extension of the deadline by which a party must deliver the

lion's share of its expert information.  Therefore, we hold that

the district court did not abuse its discretion in finding that

Cedar Point failed to comply with the expert disclosure

provisions of its accelerated discovery order.[46]

---

[46]Cedar Point even appears at times to admit that it did not comply with the discovery order by stating that it was "impossible" to comply and that their experts "did all they could do" under the circumstances.  The reasons for noncompliance, however, are relevant to the separate issue of whether the sanction imposed was appropriate.  On the other hand, a violation of an order is a violation of an order, regardless of the reasons therefor.

In this regard, we note that the question of whether a party has violated a discovery order will typically not be in dispute, as when a party fails to attend a deposition or refuses to produce certain documents.  Where the standard of compliance is a matter of degree, however, such as the degree to which an initial

As authority for its argument that Sierra Club was required to file a motion to compel before seeking sanctions, Cedar Point cites our decision in Broadcast Music, Inc. v. Xanthas, Inc., 855 F.2d 233 (5th Cir. 1988). In Broadcast Music, the plaintiff argued that the defendant should have been estopped from denying certain facts when it failed to produce documents relevant to those facts. Id. at 238. We held that the sanction of estoppel was not available because the plaintiff had not first sought a motion to compel production of the relevant documents. Id. Our rationale, however, was that the pretrial order did not explicitly compel the production of those documents in the first place; rather, the order only stated that "immediate receipt of such documents would expedite plaintiff's preparation of this case for trial or preparation of a motion for summary judgment." Id. In other words, it would have been unfair to sanction the defendant for failure to produce documents that it was never under any clear obligation to produce. In the present case, however, Cedar Point was compelled to produce the initial expert disclosures from the moment the court entered the accelerated discovery order. It was not necessary for Sierra Club to create a obligation to produce by filing a motion to compel; the obligation was already present.

---

expert disclosure is "complete," disagreement is more likely to occur. The resolution of such disputes is more appropriately left to the discretion of the trial court, and only in an unusual case of clear abuse should an appellate court reverse. See O'Malley, 776 F.2d at 499.

Moreover, Rule 37 of the Federal Rules of Civil Procedure, which governs the imposition of sanctions for failure to make disclosures, does not require that a party file a motion to compel before moving for sanctions. Instead, the rule states only that, "[i]f a party fails to make a disclosure required by Rule 26(a), any other party may move to compel disclosure and for appropriate sanctions." Fed. R. Civ. P. 37(a)(2)(a). Indeed, the Advisory Committee Notes to Rule 37 contemplate that it may be more effective in some situations to impose a sanction of excluding evidence <u>instead of</u> an order compelling production:

> [A] motion [to compel] may be needed when the information to be disclosed might be helpful to the party seeking the disclosure but not to the party required to make the disclosure. If the party required to make the disclosure would need the material to support its own contentions, the more effective enforcement of the disclosure requirement will be to exclude the evidence not disclosed . . . .

Fed. R. Civ. P. 37 advisory committee's note. Because Cedar Point intended to use its expert testimony to support its own contentions regarding harm to the environment, the district court could have concluded that excluding this testimony was the most appropriate sanction. Accordingly, we hold that the district court did not abuse its discretion in sanctioning Cedar Point for violating the discovery order without requiring Sierra Club to file a motion to compel.

Finally, we review the sanction itself. When a district court strikes a party's designation of expert witnesses and excludes their testimony as a sanction for violation of a

discovery order, we determine whether the court's action is an abuse of discretion by examining four factors:

>(1) the importance of the witnesses' testimony;
>(2) the prejudice to the opposing party of allowing the witness to testify;
>(3) the possibility of curing such prejudice by granting a continuance; and
>(4) the explanation, if any, for the party's failure to comply with the discovery order.

See Bradley v. United States, 866 F.2d 120, 125 (5th Cir. 1989) (citing Murphy, 639 F.2d at 235).

With respect to the importance of Cedar Point's witnesses, it is clear that the bulk of their expected testimony concerned the degree of harm caused by Cedar Point's discharge of produced water. Although the district court made findings regarding harm to the environment in assessing the civil penalty against Cedar Point, the court based the amount of the penalty only on the economic benefit accruing to Cedar Point from the violation. Therefore, the stricken testimony ultimately proved to be unimportant to Cedar Point's case.

As to any prejudice to Sierra Club that would result from allowing Cedar Point's witnesses to testify, we note that Sierra Club did receive more detailed information from three of the witnesses in the form of rebuttal reports. While these disclosures were made approximately two months before trial, Sierra Club should have received most of this information in initial expert disclosures a month earlier. Such a delay would have likely resulted in some prejudice to Sierra Club. While a

60

continuance would have given Sierra Club more time to review the late disclosures, such a measure "would neither punish [Cedar Point] for its conduct nor deter similar behavior in the future." Bradley, 866 F.2d at 126.

Finally, Cedar Point's reasons for failure to comply with the district court's discovery order are not persuasive. That harm to the environment would be an issue in this lawsuit was clear from the filing of the action in April 1993. Cedar Point had over nine months to solicit experts and prepare reports on this issue by the February 1, 1994 deadline. Regardless of the specificity of Sierra Club's complaint and initial disclosures, Cedar Point should have been able to produce more information regarding its defense of lack of harm than it did in its initial expert disclosures.

In light of Cedar Point's failure to adhere to discovery deadlines and the fact that the expected testimony ultimately proved to be relatively unimportant, we find that the district court did not abuse its discretion in striking Cedar Point's experts and excluding their testimony.

### 5. The Penalty and Attorneys' Fees

Cedar Point's fifth argument on appeal is that the district court erred in assessing a penalty of $186,070 against Cedar Point for violating the CWA and in awarding attorneys' fees to Sierra Club. We review the district court's findings of fact in support of the penalty under the clearly erroneous standard. See

Public Interest Research Group of New Jersey, Inc. v. Powell

Duffryn Terminals, Inc., 913 F.2d 64, 79 (3rd Cir. 1990), cert.

denied, 498 U.S. 1109 (1991).  With respect to the court's

weighing of those facts and determination of the penalty,

however, we review for abuse of discretion.  See Atlantic States

Legal Found., Inc. v. Tyson Foods, Inc., 897 F.2d 1128, 1142

(11th Cir. 1990).  Similarly, we review an award of attorneys'

fees for abuse of discretion.  Bode v. United States, 919 F.2d

1044, 1047 (5th Cir. 1990).


### a.  The Penalty

The CWA directs district courts to assess civil penalties

for violations of the CWA.  33 U.S.C. § 1319(d).  Specifically,

the statute states that violators "shall be subject to a civil

penalty not to exceed $25,000 per day for each violation."  Id.

Aside from this maximum amount, the statute guides the court's

discretion in setting the penalty as follows:

> In determining the amount of a civil penalty
> the court shall consider the seriousness of
> the violation or violations, the economic
> benefit (if any) resulting from the
> violation, any history of such violations,
> any good-faith efforts to comply with the
> applicable requirements, the economic impact
> of the penalty on the violator, and such
> other matters as justice may require.

Id.  The Eleventh Circuit has taken these statutory directives

and developed a procedural framework for calculating penalties

under the CWA.  Tyson Foods, 897 F.2d at 1142.  First, the court

is to calculate the maximum penalty that could be assessed

62

against the violator.  Id.  Using that maximum as a starting point, the court should then determine if the penalty should be reduced from the maximum by reference to the statutory factors. Id.

The district court followed the Tyson Foods framework in this case.  The parties had stipulated that there were 797 days of unpermitted discharge of produced water prior to trial.  The judgment was entered twelve days later, during which time the discharge presumedly continued.  Accordingly, the court multiplied the statutory figure of $25,000 per day by 809 days of unpermitted discharge to arrive a maximum penalty of $20,225,000.

The district court then made findings of fact with respect to the statutory factors.  First, the court found that the violation was moderately serious because of the effect of the discharge on benthic organisms[47] and the lack of monitoring and reporting with respect to the discharge.  Second, the court found that the economic benefit to Cedar Point from the violation was $186,070, which the court determined was the amount that Cedar Point saved by not disposing of its produced water in a reinjection well.  Third, the court found that Cedar Point had been violating the CWA since it began operating state well 1876. Fourth, the court found that Cedar Point had not demonstrated good faith in attempting to comply with the CWA.  In this regard, the court noted that, although Cedar Point had attempted to

_____

[47]"Benthic" organisms are those that live on the bottom of a water body.

63

obtain a NPDES permit for its discharge, it had not explored other ways to comply with the CWA.  Finally, the court reviewed Cedar Point's financial position and expected future profits from the Cedar Point field and determined that Cedar Point could at least afford a penalty equal to the economic benefit attained from the violation.

In weighing these facts and calculating the penalty, the district court held that the maximum penalty of $20,225,000 was inappropriate.  The court determined, however, that the penalty should at a minimum recapture the savings realized by Cedar Point because of the violation.  Although the court's findings with respect to the other statutory factors were also not favorable to Cedar Point, the court apparently chose not to accord these factors any weight because it did not increase the penalty beyond what it found to be the economic benefit to Cedar Point.  Accordingly, the court assessed a penalty of $186,070.

In reviewing the district court's findings of fact, we note that the court adopted Sierra Club's proposed findings and conclusions with minimal revision.  Under such circumstances, we review the court's findings of fact with caution.  FDIC v. Texarkana Nat'l Bank, 874 F.2d 264, 267 (5th Cir. 1989) ("[W]e have shown caution in reviewing district court findings which are essentially verbatim recitals of the prevailing party's proposed findings and conclusions."), cert. denied, 493 U.S. 1043 (1990).

The district court chose to calculate the economic benefit to Cedar Point by reference to the money Cedar Point saved by not

disposing of its produced water in a reinjection well.  In this regard, the court made the following findings of fact in its Memorandum Opinion:

> According to the testimony of Cedar Point's witnesses, operating an injection well would add $60,000 per year to the operating cost of the Cedar Point field.  Consequently, the economic benefit to Cedar Point of its violation of the Clean Water Act is at least $60,000 for each full year of operation.  According to other Cedar Point testimony, the cost of brine injection is in the range of $.10 to $.20 per barrel.  Thus, for 1993, the economic benefit could be determined to be between $42,000 and $84,000.

The court had found that the average daily discharge during the period of violation was 1,150 barrels per day, and there were 809 days of unpermitted discharge at the time the court entered judgment.  Using a figure of $.20 per barrel for cost of reinjection, the court thus found that the economic benefit to Cedar Point was $186,070.[48]

On June 6, 1994, Sierra Club filed a motion to alter or amend the district court's findings and conclusions pursuant to Rule 52(b) of the Federal Rules of Civil Procedure.[49]  The impetus for this motion, by Sierra Club's admission, was that some of the court's findings and conclusions did not strictly reflect the evidence that was introduced at trial.  With respect

---

[48]$.20/barrel x 1,150 barrels/day x 809 days = $186,070.

[49]At the time of Sierra Club's motion, Rule 52(b) stated, in pertinent part:  "Upon motion of a party made not later than 10 days after entry of judgment the court may amend its findings or make additional findings and amend the judgment accordingly."  Fed. R. Civ. P. 52(b) (1994).

to the court's findings regarding the economic benefit to Cedar Point, Sierra Club made the following statement:

> The Sierra Club believes that the Court's finding that the cost of injection of produced water would be approximately $0.10 to $0.20 per barrel is adequately supported based on David Russell's testimony that a disposal well would cost approximately $300,000 to outfit initially, and $900 per year to operate, as well as Mr. Russell's admission that a Cedar Point representative had testified that one type of injection well would add approximately $60,000 per year in operating costs. In addition, this finding is supported by Sierra Club Exhibit 9, which is the Federal Register notice published by the Environmental Protection Agency when it proposed its zero discharge permit for produced water. This notice specifically states that studies performed for the EPA showed that cost of brine disposal per barrel to be between $0.15 and $1.02 per barrel. See 57 F.R. 60931. The Court's figure of $.020 [sic] per barrel is hence on the conservative end of this spectrum.

In granting this motion, the court did not alter its previous findings, but supplemented those findings with the following paragraph:

> David Russell testified that the cost of injection of produced water would be approximately $.10 to $.20 per barrel and that a disposal well would cost approximately $300,000 to outfit and $900 per year to operate. Further, EPA studies show that the cost of brine disposal is between $.15 and $1.02 per barrel. On this basis, $.20 per barrel for disposal of produced water is a reasonable figure within the range found. See (Sierra Club Exhibit #9); 57 F.R. 60931.

Accordingly, the court let its original calculation of the penalty stand.

66

Some of the district court's findings do not appear to be supported by the evidence. For example, there was no testimony from any of Cedar Point's witnesses to the effect that a reinjection well would add $60,000 per year to the operating costs of the Cedar Point field. Apparently, John McGowan had mentioned this figure in his deposition, but neither party introduced that deposition into evidence and the court did not allow McGowan to testify at trial. On cross-examination, David Russell testified that, if Cedar Point constructed its own reinjection well, it would not add $60,000 per year to operating costs. Later, on redirect, Russell testified that he had read McGowan's deposition and that the $60,000 figure referred to a type of well that Cedar Point would not use to dispose of its produced water. Also, Russell never testified that the cost of reinjecting produced water would be $0.10 to $0.20 per barrel, nor did he testify that it would cost $900 per year to operate a disposal well.

The EPA cost studies cited in the court's supplementary findings, however, appeared in an exhibit introduced by both Sierra Club and Cedar Point. This exhibit was the draft NPDES general permit for produced water discharges by Coastal Subcategory operators, appearing at 57 Fed. Reg. 60,926 (1992). In this draft permit, EPA made reference to studies of the costs of reinjection of produced water. Id. at 60,931. The most recent study found that the costs of reinjection of produced water ranged from $0.15 to $1.02 per barrel. Id. Although the

67

court's finding that the cost of reinjection is $.20 per barrel falls within the range stated in the draft permit, Cedar Point argues that this range is not sufficiently specific to be a reliable indicator of what it would have cost to reinject its produced water. Specifically, Cedar Point contends that the permit does not indicate whether this range reflects the costs of paying a commercial reinjection well operator to dispose of produced water or the costs of an oil and gas operator constructing its own reinjection well and disposing of produced water itself. Russell testified that Cedar Point would not have paid a commercial injection well operator to dispose of its produced water because that would have been too expensive. Instead, Russell testified that Cedar Point would have built its own reinjection well and that such a well would have cost $300,000 to outfit initially and $0.0025 per barrel to operate.

Notwithstanding Cedar Point's challenge to the relevance of the EPA cost figures, we do not think that the district court's use of the $0.20 per barrel cost figure and subsequent calculation of an economic benefit to Cedar Point in the amount of $186,070 are clearly erroneous. The district court may have simply chosen to credit the objective evidence from the EPA studies over the testimony of Russell, one of Cedar Point's officers. Also, the court may have resolved any doubts about the accuracy of the EPA studies by choosing a cost figure near the low end of the prescribed range. Finally, and perhaps most importantly, we note that a court need only make a "reasonable

approximation" of economic benefit when calculating a penalty under the CWA.  Powell Duffryn, 913 F.2d at 80 (citing S. Rep. No. 50, 99th Cong., 1st Sess. 25 (1985)).  We are satisfied that the court's approximation of economic benefit is reasonable under the facts of this case.

Further, we do not think that the district court abused its discretion in assessing a penalty in an amount that reflected only the economic benefit to Cedar Point.[50]  The Supreme Court has described the process of weighing the statutory factors in calculating civil penalties under the CWA as "highly discretionary" with the trial court.  Tull v. United States, 481 U.S. 412, 427 (1987).  It is clear from the district court's Memorandum Opinion that it considered all of the statutory factors before settling on an amount based only on economic benefit.  Considering that the court could have imposed a penalty as high as $20,225,000, this appears to be a fair and just result.  As such, we perceive no abuse of discretion.  Therefore, we affirm the district court's assessment of a penalty in the amount of $186,070 for Cedar Point's violation of the CWA.

### b.  Attorneys' Fees

Cedar Point's sole argument with respect to attorneys' fees is that, if we hold that Sierra Club lacks standing to bring this action or that Cedar Point has not violated the CWA, Sierra Club

---

[50]Accordingly, we think it unnecessary to review the district court's findings of fact with respect to the other statutory factors.

would not be entitled to attorneys' fees as the "prevailing party" in this action.  See 33 U.S.C. § 1365(d).  Because we have held otherwise, we affirm the district court's award of attorneys' fees.

### 6.  Cedar Point's Counterclaim

Finally, Cedar Point appeals the district court's dismissal of its counterclaim against Sierra Club for abuse of process. The court dismissed Cedar Point's counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  We review a dismissal for failure to state a claim under the same standard used by the district court:  A claim may not be dismissed unless it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief.  Norman v. Apache Corp., 19 F.3d 1017, 1021 (5th Cir. 1994); Carney v. RTC, 19 F.3d 950, 954 (5th Cir. 1994).

As the basis for its counterclaim, Cedar Point alleges the following facts:  (1) Sierra Club either threatened to sue, or actually sued, all or a number of oil and gas operators in Galveston Bay under the CWA for the stated purpose of stopping unpermitted discharges of produced water; (2) in settling these disputes with the operators, Sierra Club allowed them to continue the allegedly illegal discharges in exchange for monetary consideration; (3) Sierra Club Legal Defense Fund realized substantial profits from these settlements in the form of attorneys' fees, which Sierra Club is using to finance more

70

litigation against oil and gas operators in Galveston Bay; (4) Sierra Club realized some of the monetary consideration; and (5) Sierra Club threatened Cedar Point with a similar suit with the intent to obtain monetary consideration. Cedar Point argues that this pattern of suing and settling with oil and gas operators establishes Sierra Club's intent to use the citizen suit provision of the CWA to extort money from Cedar Point. In this regard, Cedar Point notes that the purpose of a citizen suit is to stop putatively illegal conduct, and yet the terms of Sierra Club's settlements allow this conduct to continue.

Under Texas law, the elements of an action for abuse of process are:

> (1) that the defendant made an illegal, improper or perverted use of the process, a use neither warranted nor authorized by the process; (2) that the defendant had an ulterior motive or purpose in exercising such illegal, perverted or improper use of the process; and (3) that damage resulted to the plaintiff as a result of such illegal act.

Baubles & Beads v. Louis Vuitton, S.A., 766 S.W.2d 377, 378 (Tex. App.--Texarkana, no writ). "When the process is used for the purpose for which it is intended, even though accompanied by an ulterior motive, no abuse of process occurs." Id. (citing Restatement (Second) of Torts § 682 cmt. b (1977)).

The facts alleged by Cedar Point do not demonstrate an "illegal, improper or perverted" use of the citizen suit provision of the CWA. First, the "intent to sue" letter sent by Sierra Club to Cedar Point was not a "threat"; rather, the CWA requires such letters to be sent at least sixty days prior to the

commencement of a civil suit. 33 U.S.C. § 1365(b)(1). Further, the fact that Sierra Club has brought suits against other oil and gas operators in Galveston Bay, and that some of these suits were resolved through settlement, does not indicate that Sierra Club was making an illegal use of the citizen suit provision. The consent judgments generally directed the operators to cease discharging produced water after a certain grace period. Allowing such a grace period does not create an inference that Sierra Club's citizen suits were pretext for coercing monetary settlements; EPA itself will provide for grace periods in order to allow dischargers time for compliance. See, e.g., 60 Fed. Reg. 2387, 2394 (1995); see also United States v. Metropolitan St. Louis Sewer Dist. (MSD), 952 F.2d 1040, 1044 (8th Cir. 1992) (holding that district court did not abuse its discretion in approving consent decree that allowed for delay in compliance).

In addition, the operators agreed to make payments to environmental interest organizations other than Sierra Club, provided that such payments would be used for conservation and education, and not for litigation. There is nothing illegal or improper about this sort of provision; indeed, "Congress encourages settlements of this type which preserve the punitive nature of enforcement actions while putting the funds collected to use on behalf of environmental protection." Sierra Club v. Electronic Controls Design, Inc., 909 F.2d 1350, 1355 (9th Cir. 1990) (internal quotations and citations omitted). The consent judgments did provide for the payment of attorneys' fees and

72

costs incurred by Sierra Club in the litigation; however, we find nothing improper here, as such provisions frequently appear in consent judgments.  Finally, we note that these settlement agreements were reviewed and approved by the Department of Justice and EPA, as required by the CWA.  33 U.S.C. § 1365(c)(3).  In light of these observations regarding Sierra Club's settlements with other oil and gas operators, and our holding today that Sierra Club's suit against Cedar Point is meritorious, we conclude that Cedar Point has failed to state a claim for abuse of process.  Therefore, we affirm the district court's dismissal of Cedar Point's counterclaim.

**B.  Sierra Club's Appeal**

In its appeal from the district court's order amending the injunction, Sierra Club raises the following points of error: (1) the district court lacked jurisdiction to amend the injunction; and (2) the district court abused its discretion in amending the injunction.  We address each of these arguments in turn.

**1.  Jurisdiction**

We review a district court's exercise of subject matter jurisdiction de novo.  Price v. United States, 69 F.3d 46, 49 (5th Cir. 1995); In re Moody, 41 F.3d 1024, 1026 (5th Cir. 1995).  Sierra Club contends that the district court lacked jurisdiction to amend its earlier injunction because Cedar Point's notice of

73

appeal from the final judgment divested the district court of jurisdiction over the action. Sierra Club recognizes that there are exceptions to the divestment of jurisdiction under Rule 60(b) and Rule 62(c) of the Federal Rules of Civil Procedure, but argues that those exceptions do not apply.

The district court did not cite either rule as authority for its order amending the injunction, but Sierra Club addresses each possibility. If we hold that the authority for the amendment of the injunction was Rule 60(b), Sierra Club argues that the district court lacked jurisdiction because the court did not misinterpret or misapply the law and EPA's administrative order did not moot the court's initial injunction. On the other hand, if Rule 62(c) is the relevant authority, Sierra Club contends that a district court lacks jurisdiction under that rule to dissolve an injunction once its validity has been appealed.

Generally, a notice of appeal divests the district court of jurisdiction over the judgment or order that is the subject of the appeal. Henry v. Independent Am. Sav. Ass'n, 857 F.2d 995, 997 (5th Cir. 1988). Rule 62(c) provides an exception to this principle. That rule provides, in part:

> When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party.

Fed. R. Civ. P. 62(c). We have held, however, that the authority granted by Rule 62(c) does not extend to the dissolution of an

74

injunction.  <u>Coastal Corp. v. Texas Eastern Corp.</u>, 869 F.2d 817, 819 (5th Cir. 1989).  In addition, we have held that the district court's power to alter an injunction pending appeal is limited to "maintaining the status quo."  <u>Id.</u> at 820.

In the present case, the district court's amending order is more appropriately characterized as a modification--as opposed to a dissolution--of the original injunction, bringing the court's action within the ambit of Rule 62(c).  A "dissolution" would imply that the amending order altered the original injunction so that it no longer had any effect.  That is not the case here. The amending order stated that Cedar Point was not enjoined from discharging produced water as of the effective date of the final NPDES general permit and compliance order "<u>so long as</u> it complies with the terms of said General Permit and Compliance Order."  The permit and compliance order contain several conditions, including the submission of a compliance plan, operating and maintenance requirements, and notification procedures.  60 Fed. Reg. 2387, 2389-94 (1995).  If Cedar Point fails to comply with any of these terms, the court's order will act to enjoin the discharge of produced water and to impose a penalty for such discharge. Therefore, we hold that the district court's amending order had the effect of modifying the injunction under Rule 62(c), rather than completely dissolving it.

Further, we do not think that the modification exceeded the district court's limited authority to alter an injunction to "maintain the status quo."  The court's original order stated

75

that "Cedar Point Oil is enjoined from any further discharges of produced water from the Cedar Point Field to the waters of Galveston Bay, until such time as it secures an NPDES permit for such discharges." Strictly speaking, the NPDES general permit issued by EPA on January 9, 1995, is a permit for the discharge of produced water by Coastal Subcategory operators, including Cedar Point; the limitation contained in the permit, however, requires zero discharge. The effect of the compliance order is that operators covered by the general permit who were discharging produced water on the effective date of the permit are allowed to discharge produced water until January 1, 1997, so long as they continue to take affirmative steps to comply with the zero discharge limitation. The district court could have reasonably read the permit and order together as creating an opportunity for Cedar Point to be covered by a NPDES permit and to discharge produced water while covered by that permit. Accordingly, the district court modified its injunction to allow Cedar Point to take advantage of that opportunity.

With respect to the jurisdictional question, it is significant that the injunction by its own terms created the possibility for a change in its operation. Stated differently, part of the "status quo" of this action is that the court's injunction has ongoing effect, and that effect was subject to change depending upon subsequent developments. The court did not exceed its authority in stepping in to supervise this change through an amendment of its original order. Accordingly, we hold

76

that the district court had jurisdiction under Rule 62(c) to amend its original order with respect to the injunction.

### 2. Modification of the Injunction

We review a district court's orders under Rule 62(c) for abuse of discretion. See Wildmon v. Berwick Universal Pictures, 983 F.2d 21, 23 (5th Cir. 1992). Sierra Club contends that the district court abused its discretion in modifying the injunction because the modification was contrary to the original purpose of the injunction. Specifically, Sierra Club argues that the general NPDES permit does not give Cedar Point the authority to discharge produced water, and therefore does not trigger a change in the injunction's effect. To the contrary, Sierra Club points out that the permit prohibits Cedar Point from discharging produced water and that only after the court altered its injunction was Cedar Point eligible for the two-year grace period established by the compliance order. Consequently, Sierra Club concludes that the court misread the permit and order as creating a "carte blanche" for oil and gas operators in Galveston Bay to discharge produced water until 1997.

Generally, a court should only modify an injunction to achieve the original purposes of the injunction, if those purposes have not been fully achieved. See United States v. United Shoe Machinery Corp., 391 U.S. 244, 248-49 (1968). We do not dispute Sierra Club's reading of the final general NPDES

permit and compliance order; nevertheless, we do not think that the district court's modification of the injunction deviated from the original purpose of the injunction. That purpose was to prohibit the <u>unpermitted</u> discharge of produced water into Galveston Bay. Under the injunction as modified, Cedar Point is subject to a general permit applying to all produced water discharges by Coastal Subcategory operators in Louisiana and Texas and is legally discharging produced water according to the terms of the compliance order. Meanwhile, the injunction remains in effect and provides for penalties against Cedar Point if it violates the terms of the general permit or compliance order. Also, under the terms of the compliance order, Cedar Point will have to take affirmative steps to eliminate its produced water discharges and, in any event, will have to cease such discharges by January 1, 1997. Finally, we note that the ordering of Cedar Point's legal obligations effected by the modified injunction is highly preferable; that is, it is more appropriate that Cedar Point's produced water discharges are primarily regulated by a permit and order issued by EPA than by a continuing injunction supervised by a federal district court. Accordingly, we hold that the district court did not abuse its discretion in modifying the original injunction.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.